**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLEMING COMPANIES, INC., et al. | ) | Case No. 03-10945 (MFW) |
| Debtors. | ) | |
| | ) | |
| | ) | |

<u>OPINION</u>[1]

Before the Court are the First Quarterly Interim Fee
Applications filed by the various professionals involved in this
case.  A report on and objection to those fee applications was
filed by the United States Trustee ("the UST").  For the
following reasons we sustain the objection in part and state our
intent to reduce the fees requested by certain professionals.


I.   <u>FACTUAL BACKGROUND</u>

On April 1, 2003, Fleming Companies, Inc., and several of
its affiliates ("the Debtors") filed voluntary petitions under
chapter 11 of the Bankruptcy Code.  Applications were filed to
retain professionals for the Debtors on the first day.  After
notice and hearing, the applications were granted and the Debtors
were authorized to retain, <u>inter alia</u>, Pachulski, Stang, Ziehl,
Young, Jones & Weintraub P.C. ("Pachulski") and Kirkland & Ellis

---

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052, which is made applicable to contested
matters by Federal Rule of Bankruptcy Procedure 9014.

LLP ("Kirkland") as counsel for the Debtors.

A motion for approval of interim compensation procedures ("the Procedures Motion") was also filed by the Debtors which was granted when no objections were filed after notice was given. The Procedures Motion provides that the professionals in the case may be paid 80% of their fees and 100% of their expenses on a monthly basis after filing and providing notice to interested parties of their monthly bills.  Those payments are, however, subject to the subsequent filing of quarterly fee applications and ultimate allowance by the Court after notice and a quarterly fee hearing.[2]

The parties complied with that procedure and the first interim fee applications (which seek in excess of $25 million in fees and expenses) were filed on or about August 19, 2003, covering the period from April 1 through June 30, 2003.  The first quarterly fee hearing was scheduled for September 26, 2003. Because of the press of matters listed for hearing in this case on that date and the subsequent omnibus hearing date, we continued the hearing on the fee applications generally and stated our intent to review the fee applications and objections.

On September 22, 2003, the UST filed a Report and Objections to the pending fee applications of several of the professionals.

---

[2]   See In re Mariner Post-Acute Network, Inc., 257 B.R. 723 (Bankr. D. Del. 2000).

2

The professionals responded to those objections, contesting the assertions of the UST.  Kirkland and Pachulski filed supplemental responses on December 1, 2003, after we advised the parties that we were prepared to rule on the fee applications based on the pleadings.

For the following reasons, we sustain the UST objections in part, and for additional reasons we articulate below, we state our intent to approve the fee applications of certain professionals only in a reduced amount.  We will hold a hearing on February 10, 2004, at 9:30 am to permit the affected applicants to present evidence in response to the concerns we have raised.

II.  JURISDICTION

        This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A), (B), and (O).

III.  DISCUSSION

    A.  Review of Fee Requests Generally

The UST properly notes that it is charged with the duty of monitoring fee applications and "whenever the United States trustee deems it to be appropriate, filing with the court comments with respect to the approval of such applications."  28 U.S.C. § 586(a)(3)(H).  The UST has been designated as the

"watchdog" of the chapter 11 system charged with the duty to assure that the spirit and the substance of the Bankruptcy Code is followed. See, e.g., Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.), 898 F.2d 498, 500 (6th Cir. 1990).

Nonetheless, the Bankruptcy Court has an independent duty to review fee requests of all professionals retained in a chapter 11 case to assure that the services rendered were necessary and appropriate and that the fees requested are reasonable. See, e.g., In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 841 (3d Cir. 1994). The court "must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." Id. at 844.

Under section 330(a), the court may award "reasonable compensation for actual, necessary services rendered" by the attorney and by other professionals "based on (i) the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv) the time spent on the services, and (v) the cost of comparable services in non-bankruptcy cases." Busy Beaver, 19 F.3d at 840. "[T]he court should not allow compensation for (i) unnecessary duplication of services; or (ii) services that were not I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A). The applicant bears the burden

4

of proving that the fees and expenses sought are reasonable and necessary.  See, e.g., Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc., 50 F.3d 253, 261 (3d Cir. 1995).

"[T]he Court must conduct an objective inquiry 'based upon what services a reasonable lawyer or legal firm would have performed in the same circumstances.'"  In re Cenargo Int'l, PLC, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003) (quoting In re Ames Dep't Stores Inc., 76 F.3d 66, 72 (2d Cir. 1996)).

A "judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the starting point for any analysis."  Busy Beaver, 19 F.3d at 854. The court should then consider any evidence submitted with the application or at a hearing.  Id.

> Analytically, section 330(a) sets up a two-tiered test for determining whether and in what amount to compensate bankruptcy attorneys.  First, the court must be satisfied that the attorney performed actual and necessary services.  Second, the court must assess a reasonable value for those services.

In re Gencor Industries, 286 B.R. 170, 176-77 (Bankr. M.D. Fla. 2002).

Where a court reduces fees, however, "section 330(a) on its face first contemplates the applicant's right to a hearing." Busy Beaver, 19 F.3d at 846.  Further, an opportunity must be afforded to a good faith applicant who attempts to comply with the applicable rules governing the format and content of fee

applications to amend the fee application to remedy deficiencies such as lumping or insufficient detail.   Id.

In this case, the professionals are sophisticated chapter 11 practitioners fully familiar with the requirements of the Code and Rules regarding the preparation of fee applications.   Thus, their fee requests generally conform to the Rules and do not have insufficient detail or lumping.   The concerns that the UST has raised (and that this Court has) are substantive and not simply the failure to comply with the formalistic requirements of fee application preparation.

The problem that the Court has with the fee requests is that many of the actions taken by Debtors' counsel in this case were improper or appeared to be designed to frustrate the legitimate rights of the other parties in this case.   The Court has advised counsel for the Debtors, on numerous occasions, that it considered their actions inappropriate.   Nonetheless, at virtually every hearing in this case, the Court was presented with additional evidence of improper actions by counsel. Ultimately, the Court warned counsel of its intention to reduce their fees because of this activity.

We believe, therefore, that the reductions we make to the fees requested are not of the type which the Third Circuit suggested warrant further notice and a hearing or the opportunity to amend the fee application.   Nonetheless, to the extent the

6

professionals affected by this decision feel that further evidence would assist the Court, they will be afforded that opportunity.  See, e.g., In re Top Grade Sausage, Inc., 227 F.3d 123, 131 (3d Cir. 2000)(due process afforded where fee applicant had ample time to correct the record or ability to request a follow-up hearing and chose not to do so).[3]

B.   Counsel for the Debtors

1.   Specific Concerns of the UST

a.   Numerous Counsel for the Debtors

One of the UST's objections was that the number of attorneys for the Debtors on this case was excessive, particularly the number present at each hearing.  The UST argues that this constitutes unnecessary duplication of effort warranting a reduction in fees.  Counsel for the Debtors assert that in large cases it is necessary to have numerous counsel working on a case and that coordination of effort is essential.  In their responses, they submitted a report explaining the contribution of each attorney at the hearings.

In cases where multiple attorneys are attending a hearing, "we expect all of the professionals attending to have a role. . . . If two or more professionals are billing time, they each

---

[3]   Perhaps anticipating our ruling, counsel for the Debtors in the supplemental responses filed on December 1, 2003, have already requested a hearing in the event we are inclined to reduce their fees.

should make a contribution." In re Jefsaba, 172 B.R. 786, 809-10 (Bankr. E.D. Pa. 1994)(disallowing fees related to attorney performing work duplicative of others, but allowing fees for attorney attending hearing only when he was handling a matter).

A review of the record reveals that, on average, there were five to six attorneys representing the Debtors at every hearing during the period covered by the first interim fee applications. Although the Court recognizes the importance of adequate representation, especially in a complex bankruptcy case, it expects the time expended at the hearings "to be commensurate with the anticipated benefit to the estate and that unproductive time will be written off." Id. at 799.  We conclude that a reduction of fees is warranted because counsel for the Debtors have not adequately demonstrated that each attorney present contributed to the hearing in a meaningful way.

For example, at every hearing in this case there were at least two Pachulski attorneys in attendance.  Pachulski's supplemental response explains that Ms. Jones "coordinated the hearing from the debtors' perspective" and, at some of the hearings, handled certain discrete matters, while Mr. Lhulier "performed case coordination tasks."  At the same time, Kirkland's supplemental response identified specific tasks performed by each attorney attending a hearing, but in some instances merely identified an attorney as "leading hearing

attorney."

We believe that it was unnecessary to have two or three attorneys "coordinating" or "leading" the hearing.  Therefore, unless Ms. Jones handled a specific matter, the estate should not be charged with her time; Mr. Lhulier was capable of doing whatever coordinating was necessary.  Further, many of the Fleming hearings lasted for hours; the estate should not be charged for attorneys whose matters have concluded with the time spent by them waiting for other matters to end.

In addition, over $100,000 in travel expense reimbursement is sought by counsel for the Debtors for traveling to Wilmington for the hearings.  Because this is the first interim fee request and bills often come in late, we expect that the real cost of attending hearings was considerable more.  Since many of the travel expenses were unnecessary, they should not be allowed.

We, therefore, will require that Kirkland and Pachulski identify the amount of time at any specific hearing that each attorney spent on the matters for which they bore responsibility. In addition, the travel-related expenses sought by each firm should identify which attorney incurred the expenses and on what date.

The UST also urges the Court to reduce the compensation requests because with numerous attorneys on the file, endless intra-office conferencing was required to assure that all counsel

on a particular matter were apprised of developments in other matters that may impact their role.

The Debtors' counsel argues that intra-office conferences were essential in the administration of this mega case so that matters and issues could be discussed and coordinated.  They assert that such time is compensable.  Jefsaba, 172 B.R. at 801. "All participants may bill for the time spent in the intra-office conferences with the caveat that the normal requirements of specificity . . . and reasonableness apply."  Id. at 800. Pachulski asserts in its supplemental responses that the use of many attorneys in both firms (which required numerous intra-office conferences for coordination) allowed the case to be handled "seamlessly" between the two firms.

While we agree with counsel for the Debtors in concept that having different attorneys handle different matters can achieve efficiencies, from our observations in this case their coordination has been abysmal.  At several hearings in this case for example, opposing counsel have asserted that they have reached agreements with the Debtors (for a continuance or settlement of the underlying matter) only to be told by counsel in the courtroom that there is no deal.  The situation became so grave that at one hearing, a recess was ordered while counsel for the Debtors was directed to put additional counsel on the phone who had actually been dealing with the specific creditor.  In

10

most instances, the creditor was correct and counsel for the
Debtors in the courtroom was incorrect.

In its objection, the UST has compiled data related to the
amount of time Debtors' counsel spent on intra-office
conferencing.  It searched the fee applications for the term
"confer" and generated spreadsheets which reflect the result.
The spreadsheets reveal more than 3,700 time entries by Kirkland,
and 1,600 time entries by Pachulski use the word "confer."
However, the UST does not provide the total number of time
entries, which would allow us to assess the reasonableness of the
intra-office conferencing.  We request additional detail from
counsel for the Debtors and the UST on this point.

b.   <u>Higher Rates for Bankruptcy Attorneys</u>

The UST contended that Kirkland charged higher rates for the
services of bankruptcy attorneys than for services of comparable
non-bankruptcy attorneys with similar experience.  While Kirkland
asserts that this issue was resolved by providing additional
information to the UST, that information has not been provided to
the Court.  The information that was submitted to the Court by
Kirkland does demonstrate that the services of bankruptcy
attorneys are consistently billed by it at higher rates than non-
bankruptcy professionals with similar experience.  For example,
Kirkland charged hourly rates for the services of Maureen
Sweeney, a corporate partner, and Damian Capozzola, a litigation

11

partner, that are $50/hour less than the hourly rate charged for
the services of Geoffrey Richards, a bankruptcy partner admitted
to practice the same year.   Similarly, Kirkland charged $50/hour
more for the services of Richard Wynne, a bankruptcy partner,
than it did for the services of Gregg Kirchhoefer, an
intellectual property partner admitted in the same year.

Kirkland argues that the UST has applied the wrong test.
Kirkland asserts that the issue is whether the specific attorney
with bankruptcy expertise charges the same rate for debtors,
creditors or other interested parties in a bankruptcy matter, not
whether another attorney with his same experience in another
practice area charges the same rate.

We disagree.   In enacting the Bankruptcy Code provisions
which allow compensation to attorneys, Congress sought to
encourage qualified attorneys to develop bankruptcy expertise by
assuring that they would be compensated at the same level as
their peers in other practice areas.   "Section 330(a) does not
entitle debtors' attorneys to any higher compensation than that
earned by non-bankruptcy attorneys" and the Court must ensure
that the applicant "exercises the same 'billing judgment' as do
non-bankruptcy attorneys."   Busy Beaver, 19 F.3d at 855-56
(quoting In re Manoa Fin. Co., 853 F.2d 687, 690 (9th Cir. 1988).
Thus, we conclude that the hourly rates of bankruptcy
practitioners must be commensurate with the hourly rates charged

12

by their peers in other practice areas.  To assess this we will require that Kirkland provide a schedule of the hourly rates of all its attorneys and paralegals in all practice areas and offices.[4]

The UST also asserts that Pachulski staffed the case with a disproportionate number of senior personnel.  It alleges that the number of hours worked by senior personnel constituted approximately 85% of the total hours worked by attorneys at the firm.  The UST argues that this top heavy arrangement, where partners bill a disproportionate amount of time, is impermissible.  See, e.g., In Zolfo Cooper v. Sunbeam-Oster Co., Inc., 50 F. 3d 253, 260 (3d Cir. 1995)(in capping rates of accounting firm, bankruptcy court noted that firm had "duplicated effort[s], used too many high-level personnel and submitted an incomplete fee application"); Ursic v. Bethlehem Mines, 719 F.2d 670, 677 (3d Cir. 1983)("routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates.  A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn").

Pachulski responded that the "senior personnel" referenced

---

[4] In its supplemental response, Kirkland provided a chart of hourly rates for certain individual attorneys at other firms who practice bankruptcy law.  This was not helpful since it did not identify all of the hourly rates for all attorneys at those firms, or even the hourly rates of all bankruptcy attorneys at those firms.

by the UST is distorted.  It notes that although the personnel
used by it had many years of experience, the hourly rates they
charged were significantly lower than others with the same
experience.  In fact, Pachulski notes that its blended hourly
rate of approximately $419[5] is significantly less than many other
firms and evidences its efforts to use lower rate personnel
appropriate to the task performed.

This is not true in comparison with other firms in
Wilmington, however.  In its original response, Kirkland attached
a Blended Rate Survey.  This included selected firms and their
blended rates in bankruptcy cases.[6]  Based on that chart, it
appears that Pachulski's blended rate is more than most other
firms in this city.  To evaluate the appropriateness of
Pachulski's staffing, we will require additional evidence on this
point, including a complete survey of Wilmington firms and other

---

[5]  Pachulski asserted that the UST's blended rate was
inappropriate because it was based on attorneys' rates only and
did not include paralegals' rates.  Pachulski asserts that the
correct blended rate is $341, comprised of attorneys' fees only.
It asserts this formula is preferable because using the UST's
method would actually increase the costs to the estate as firms
would be encouraged to use lower level attorneys rather than
paralegals in hopes that it would lower their blended rates.  We
disagree.  Because the Court must assure that tasks are performed
by the appropriate personnel, we would not approve fees for
attorneys to perform tasks more appropriately done by paralegals.

[6]  The Court has not had a chance to confirm the rates or to
determine if the "survey" done by Kirkland is representative of
the blended rates of bankruptcy professionals appearing in this
Court.  This should be addressed at the further hearing on these
fee requests.

14

major firms practicing before us and their blended rate based on all attorneys and paralegal billing fees in bankruptcy cases.

## 2.  Specific Concerns of the Court

This Chapter 11 was commenced on April 1, 2003.  At nearly every hearing in this case, the Court has admonished counsel for the Debtors about numerous failures, including failure to comply with the notice requirements of the national or local Bankruptcy Rules, failure to comply with prior directions of this Court, misrepresentations made to this Court and to opposing counsel, and wasteful actions taken by counsel.  The overall conduct of this case has been contentious, disorganized and wasteful of the time and efforts of both this Court and other counsel involved in the case.  The warnings of the Court have gone unheeded by counsel for the Debtors as the same "mistakes" continue to be made time and again.

The Court has no other alternative but to reduce the fees requested.  In addition, "if the amount of . . . interim compensation exceeds the amount of compensation awarded . . . [the court] may order the return of the excess to the estate." 28 U.S.C. § 330(a)(5).  See, e.g., In re W.T. Mayfield Sons Trucking Co. Inc., 225 B.R. 818 (Bankr. N.D. Ga. 1998)(bankruptcy court may order disgorgement of fees when attorney has ignored reporting and court approval duties imposed by the Code).

The following are mere examples of conduct of counsel which

15

has necessitated this action.

a. <u>Cash Management Order</u>

At the first hearing held in this case on April 2, 2003, the
Debtors sought approval of their cash management system.  Prior
to the hearing, several creditors expressed informal objections
to counsel for the Debtors.  Specifically, they asserted that the
Debtors (who acted as their billing or collection agent) were in
possession of cash which belonged to the creditors and not the
Debtors.  Counsel for the Debtors agreed to modify the proposed
order accordingly and a revised order was presented to the Court
for entry by agreement.[7]  That Order was entered.

At a subsequent hearing held on April 10, 2003, creditors
asserted that the Debtors were not complying with that Order.
Counsel for the Debtors stated that they were segregating post-
petition funds but the dispute was about funds that had been
collected by the Debtors and commingled pre-petition.

At a subsequent hearing on April 24, 2003, counsel for the
Debtors advised that they understood the Cash Management Order
(1) to apply only to one creditor and (2) not to apply to funds
of creditors which came into the Debtors' possession post-

_____

[7]  Paragraph 11 of the Cash Management Order states: "The
Debtors act as a paying agent or collection agent for certain
third parties.  To the extent Debtors obtain or have obtained
post-petition funds of those parties for the purpose of paying
obligations of those parties, the Debtors are authorized and
shall use such funds to pay the obligations for which they were
obtained."

petition but resulted from pre-petition services by the Debtors.
After hearing the arguments of the parties and reviewing the
April 2 Order, we disagreed with the position of counsel for the
Debtors and stated that we had not, by any order we had entered,
authorized the Debtors to use money that they were merely holding
for other parties or that did not belong to them.

Notwithstanding that ruling, counsel for the Debtors
continued to assert that they were not obligated to segregate or
turn over funds they collected post-petition for services they
rendered pre-petition as a billing or collection agent for
others.  Counsel continued to argue that the cash management
order did not preclude their use of those moneys; we continued to
admonish counsel that no order entered in this case permitted the
Debtors' use of that money.

As a result of the position taken by counsel for the
Debtors, numerous creditors were required to file adversary
actions for turnover of their funds.  We were required to hold
hearings on these matters, wasting innumerable hours of counsels'
and our time.  In each instance, a temporary restraining order
was entered precluding the Debtors from using those funds.  The
Debtors filed motions for relief from those Orders.  At a hearing
held on May 6, 2003, the Debtors stated that they were not
segregating funds unless there was an express order.  We stated
that the Cash Management Order was an express order.

Nonetheless, counsel for the Debtors did not segregate funds for all similar creditors until a class action suit was filed and a temporary restraining order was granted on June 10, 2003.   To this day, the Debtors have continued to frustrate the efforts of those entitled to these funds by, <u>inter alia</u>, not providing class action counsel with information relating to the parties in that class.

We conclude that the efforts of counsel for the Debtors in contesting these adversaries provided no benefit to the estate. <u>See</u>, <u>e.g.</u>, <u>In re Vargas</u> 257 B.R. 157, 167 (Bankr. D. N.J. 2001) (directing debtor's attorney to disgorge fees because he failed to render any valuable services when he filed unwarranted and unsubstantiated pleadings);  <u>Top Grade Sausage</u> 227 F.3d at 132 (affirming disallowance of fees of debtors' attorneys as not reasonably benefitting the estate because services were rendered solely to debtor out of possession and duplicative of trustee's work).

We, therefore, intend to disallow all fees incurred in connection with those efforts.  Counsel for the Debtors should provide a detail of the amount of time spent on this within thirty days of this ruling.

### b.  <u>DEC Investments Motion</u>

On July 8, 2003, DEC Investments LLC filed a Motion to compel compliance with section 365(d)(3) (Docket # 1860).  That

Motion asserted that the Debtors owed DEC post-petition rent.
The Debtors objected to the motion, insisted upon discovery and a
trial.  At the conclusion of the hearing (which lasted all day
and involved extensive cross-examination by Debtors' counsel),
counsel for the Debtors conceded most of the items sought were in
fact due by the Debtors.  When asked why the Debtors had insisted
on wasting everyone's time with a trial, counsel stated that the
burden was on the movant to prove its case.  At that time we
advised counsel for the Debtors that we would reduce their fees
for such litigious actions.  See, e.g., In re Cenargo Int'l,
PLC., 294 B.R. 571, 605 (Bankr. S.D.N.Y. 2003)(reducing fees
where work performed "seems to have been motivated less by what
was best for the estates and creditors than by the desire to make
a litigation point").

Therefore, we are inclined to reduce fees for this category.

### c.  Rejection of Leases

On June 9, 2003, the Debtors' counsel filed a Motion for
approval of procedures for rejection of unexpired leases or
executory contracts (Docket # 1383).  The Debtors proposed by
their Motion to reject leases, without further Court order, by
giving ten calendar days written notice to the landlords.
Numerous landlords objected.  At the hearing held on the Motion
on June 25, 2003, we denied the Motion because the procedures did
not give landlords (and other parties in interest) the requisite

19

notice and because an order is required whenever a lease is
rejected.

Notwithstanding our denial of that Motion, the Debtors
nonetheless sent a Notice (Docket # 1817) dated July 2, 2003,
which purported to provide for rejection of leases effective June
30, 2003, and provided landlords eight days to file an objection.
As a result of that notice, landlords were again required to file
objections in this Court (five did so).  Once again we were
required to admonish counsel for the Debtors to comply with the
Bankruptcy Rules and our prior Orders.  See, e.g., In re
Saturley, 131 B.R. 509, 521 (Bankr. D. Me. 1991)("futile efforts
aimed at achieving unattainable objectives are unreasonable" and
"fees generated at tilting at windmills will be disallowed").

In addition, the Debtors have filed numerous Motions in this
case seeking nunc pro tunc rejection of leases or executory
contracts.  Normally, the effective date of a rejection is the
date the Order is entered.  See, e.g., In re National Record
Mart, Inc., 272 B.R. 131, 133 (Bankr. W.D. Pa. 2002)(agreeing
with the general principle that the effective date of a debtor's
rejection of an unexpired lease is the date the court enters the
order); In re Appliance Store, Inc., 148 B.R. 234, 240 (Bankr.
W.D. Pa. 1992)(finding that the plain unequivocal language of
section 365 states that court approval is a precondition to a
debtor's rejection of a lease).  See also In re Amber's Stores,

20

Inc., 193 B.R. 819, 825-26 (Bankr. N.D. Tex. 1996)(noting that
the majority of courts have found that the effective date of
rejection is the date of the entry of the bankruptcy court's
order approving rejection).

Rejection has been allowed nunc pro tunc to the date the
Motion is filed or the premises is surrendered, whichever is
later, only in certain circumstances.  See In re CCI Wireless,
LLC, 279 B.R. 590 (Bankr. D. Colo. 2002)(holding that a Court,
"when principles of equity so dictate, may approve a rejection of
a nonresidential lease pursuant to section 365(a) retroactive to
the motion filing date").  See also In re Valley Media, 2003 WL
21956410 (Bankr. D. Del. Aug. 14, 2003)(stating that "nunc pro
tunc is a form of extraordinary relief" before granting
committee's request for approval to bring a derivative action
nunc pro tunc).  To grant nunc pro tunc rejection, the Debtors
must have stated an unequivocal intent to reject the leases.
See, e.g., Amber's Stores, 193 B.R. at 826 (explaining minority
view that "rejection is effective when the landlord receives
unequivocal notice of the debtor's intent to reject the lease").

Notwithstanding that standard, on numerous occasions the
Debtors have sought nunc pro tunc rejection of leases, in some
instances effective before the motion was filed.  After filing
such motions, the Debtors have often sought to modify that motion
by deleting leases and, in some instances, adding leases to the

list to be rejected.  On several occasions, we denied the request
to modify unless the affected landlord consented.  However, since
the Debtors continued to change their minds about which leases
they wish to reject, we recently advised counsel for the Debtors
that their actions in this case do not rise to the level required
for nunc pro tunc rejection and that we would not in the future
approve such relief without express consent of the affected
landlord.  This, of course, may have a deleterious effect on the
estate and creditors in this case because additional
administrative expenses may accrue.  At a minimum, the fees
charged for modifying the Motions to reject should be denied.

### d.   Modification of Pleadings

In this case, there have been an inordinate number of
pleadings modified by counsel for the Debtors.  It is unclear why
this occurred.  In some instances, however, it appears to be an
effort by the Debtors to gain an advantage over opposing parties
(by seeking relief to which the Debtors may not be entitled in
the hope that it will be granted when no one objects).  Such
tactics have caused other parties to object to pleadings only to
have the Debtors modify the relief requested, wasting both
counsels' and the Court's time.  Counsel should file pleadings
requesting only relief they are confident is warranted.

Accordingly, we are inclined to reduce fees requested for
filing modified pleadings.

e.   <u>Omnibus Hearing Dates</u>

Under our Local Rules, omnibus hearing dates are set twice a
month in large chapter 11 cases.  The procedures require that
counsel for the debtor obtain hearing dates from our Courtroom
Deputy, file a certification of counsel with an attached order
setting those dates, and deliver a copy of the certification and
order to Chambers for entry.  In this case, counsel for the
Debtors partially complied with those requirements.  Counsel did
obtain dates and on July 14, 2003, filed a certification with
dates for hearings from September 4 through December 23, 2003.
However, counsel failed to deliver a copy of the certification or
proposed order to the Court for entry until September 30, 2003.
By that time, several of the hearing dates had passed and it was
too late for opposing counsel to serve notice of motions in time
to be heard on other dates.  In the interim, our Courtroom Deputy
was deluged with calls from interested parties and counsel who
were not sure of the omnibus dates.  It was not until Chambers'
staff contacted counsel for the Debtors requesting a copy of the
proposed order that it was delivered.

The Court is unable to ascertain whether counsel's failure
was through inadvertence or for a more nefarious purpose.[8]  In

---

[8]   Under our Local Rules, in order to file a Motion, a party
must designate a hearing date (normally an omnibus date), which
provides the requisite days notice to other parties.  In this
case, other parties may have delayed filing motions while waiting
for the omnibus hearing date order to be entered.

any event, we are inclined to deny the fees incurred in preparing
that pleading or in rectifying the error.

### f. Reclamation Procedures

On April 2, 2003, the Debtors filed a motion for approval of
a process by which reclamation claims could be determined (Docket
# 8).  Many creditors opposed the procedures, asserting that the
Debtors were simply seeking to foreclose efforts by them to
obtain a replacement lien or administrative claim under section
546.  We granted the Debtors' Motion and entered an Order on
April 22, 2003, that required the claimants to submit details of
their claims to the Debtors and the Debtors to analyze and
respond to the reclamation claims within ninety days (Docket #
559).

Thereafter, the Debtors filed two motions seeking
"additional" procedures which, in essence, delayed both the
Debtors' analysis and any relief to the reclamation creditors.
Again, affected creditors were required to object and many did
so.  We denied both motions and ordered the Debtors to comply
with the original procedures which they had proposed.  Although a
report was filed by the Debtors, it contained little more than a
summary of what claims were filed, with no analysis and no
indication of what goods the Debtors had on hand as of the
petition date.

Recently the Debtors filed a Motion seeking to disallow all

reclamation claims on legal grounds asserting that the secured
lenders' liens are superior to the reclamation claimants' and
fully secured by all inventory owned by the Debtors on the
Petition Date.   Thus, the Debtors now assert it is unnecessary to
do any factual analysis of the reclamation claims.   If this is
correct, then any analysis performed by the claimants and the
Debtors was simply academic and of no value to the estate.

In the interim, the action of the Debtors in filing the two
motions to modify the reclamation procedures was nothing more
than a delaying tactic, wasting the Debtors' and this Court's
precious time.   Accordingly, all fees related to those Motions
should be denied.   See, e.g., Bachman v. Pelofsky (In re
Peterson), 251 B.R. 359, 365 (B.A.P. 8th Cir. 2000)(affirming
refusal to award fee where "efforts resulted in no benefit to the
debtor under section 330(a)(4)(B), other than to cause delay in
payment").   Within thirty days, counsel for the Debtors should
provide a detail of the amount of time spent by them in preparing
and prosecuting those Motions, and analyzing the reclamation
claims.

> g.   Bar Date Order

On July 17, 2003, the Debtors filed a Motion for an Order
clarifying the applicability of the Bar Date Order that had
previously been entered (Docket # 2005).   The basis of the Motion
was the ruling by Mr. Justice Tysoe of the Supreme Court of

British Columbia on the applicability of the bar date to Canadian
creditors (Docket # 2005, Exhibit B).  No objections were filed
to the Motion.  However, at the August 4, 2003, hearing, we
advised the Debtors that the form of order presented by counsel
for the Debtors did not, in fact, comply with the ruling of
Justice Tysoe.  We directed counsel to submit a revised form of
order under certification of counsel.  Counsel for the Debtors
did so.  However, once again the proposed order submitted by them
did not conform to the ruling of Justice Tysoe.  As a result, we
were required to modify the order ourselves.  If Justice Tysoe's
Order were not just three pages long, we would think this was a
mistake.  We do not think that was the case.  Instead, we
conclude that the failure to comply with Mr. Justice Tysoe's and
our rulings was deliberate and an effort to mislead or prejudice
the Canadian creditors.  We are, therefore, inclined to reduce
all fees incurred in connection with this effort.

### h.  Motion to Reduce Reserve

A prime example of what this Court considers to be
inappropriate litigation tactics by counsel for the Debtors is
evident in the Debtors' conduct during the sale of their assets.
In connection with their Motion to sell certain assets, the
Debtors agreed to give the buyer an option period of six months
to decide whether to assume certain leases or executory
contracts.  Nonetheless, the Debtors sent notice to the parties

26

to all their leases and executory contracts of the potential
intent to assume and assign their contracts and what the Debtors
believed to be their cure amount.   In most instances the cure
amount was stated to be zero.   As a result,  over 500 objections
(many involving numerous contracts) were filed to the sale
motion.   In those objections, as required by the sale procedures,
the other parties stated what they asserted was their cure
amount.

Initially, the Debtors insisted that the Court hold an
evidentiary hearing and determine the amount of the cures before
approving the sale.   Since this involved literally thousands of
contracts, numerous factual and legal issues, and would
constitute an advisory opinion (since the buyer had made no
decision to take an assignment of any of them) we declined to do
so.[9]

The Debtors thereafter insisted on continuances, asserting
they needed protracted discovery on the cure disputes.   Since the
leases were not yet designated as ones the buyer or its designee
wanted, we set many of the matters for separate hearing and
permitted discovery by both parties.   However, over the objection

---

[9]   To resolve the impasse, the buyer agreed to adjustments
to the asset purchase agreement to accept most of the burden of
cures.   In contrast to the Debtors' recalcitrance, the buyer and
its counsel have used herculean efforts to resolve the cure
disputes consensually, which have largely been successful to
date.

of the Debtors, we also directed that sufficient funds be
escrowed from the sale proceeds to cover all the asserted cure
claims for which the Debtors might be liable.

At the hearing scheduled for October 2, 2003, one of those
matters was due to be tried.  However, the Debtors filed a last
minute request for a continuance, asserting they needed
additional discovery.  At that same hearing, however, the Debtors
sought to be heard on a Motion filed by them to reduce the
reserve being held for cures.

Because we view these tactics of counsel for the Debtors to
be inappropriate, we are inclined to reduce Debtors' counsel fees
for these actions.

i.  Copy Charges

Normally, this Court does not reduce expenses for copying
charges so long as they do not exceed the fifteen cents permitted
by the Local Rules.  However, once again this is an unusual case
and we are forced to reduce the copy expenses sought by counsel
for the Debtors for many reasons.

A court should approve reimbursement of expenses to the
extent they are shown to be "actual" and "necessary." 11 U.S.C. §
330(a)(1)(B).  This provision reflects Congress' intent to
protect the estate from excessive and unreasonable expenditures.
See, e.g., In re Poseidon Pools of America, 216 B.R. 98, 101
(Bankr. E.D.N.Y. 1997)(denying reimbursement for photocopying and

28

other expenses because there was no showing that disbursements
were necessary or were excluded from firm's overhead).

We are compelled to reduce the copy costs sought by
Pachulski in this case because, despite the Local Rules and
procedures, they included in hearing binders copies of pleadings
that were not necessary.  For example, they included copies of
certificates of service and the extensive service lists and
"related pleadings" which were no longer relevant to the matter
which was to be heard that day.  Further, copies of objections
which had already been resolved continued to be included in the
binders when other objections were the only ones being heard that
day.  As a typical example, at the hearing held on November 4,
2003, four of the seven binders (representing literally hundreds
of pages) contained pleadings of matters which the Agenda Notice
stated were continued.[10]

Including these extra pleadings not only increased the copy
costs to the estate but wasted the time of the Court and
Chambers' staff in reviewing the binders in preparation for the
hearings.  We continually reprimanded counsel for the Debtors for
this.  In several instances, we handed counsel from Pachulski the
excess binders at the beginning of the hearing.  The practice
ceased only recently after we advised Pachulski that we would not

---

[10]  This, of course, does not apply to matters which were
continued _after_ the Agenda Notice and hearing binders were
delivered to Chambers.

reimburse them for this.  A reduction in costs as well as the paralegal time in preparing the binders is warranted.

j.  <u>Motions to Shorten Notice</u>

The Local Rules require at least 15 days notice of the hearing on any motion in a case (longer if service is by mail or the Federal Rules of Bankruptcy Procedure mandate it).  Since omnibus hearing dates are set in larger cases months in advance (at the request of counsel for the debtor), motions to shorten notice by the Debtor should be necessary only in true emergency circumstances.

In this case, we have seen an exorbitant number of Motions to shorten notice filed by the Debtors.  In the period covered by the first interim fee applications, the Debtors filed a total of sixteen motions which they asserted were emergencies worthy of shortening notice.  (This does not include any of the Motions filed on the Petition Date which are heard on shortened notice.) "Emergency" motions thus represented 30% of all motions filed by the Debtors during that period, excluding pro hac vice motions and the first day motions.

"Just as the hourly rates charged must be reasonable, so must the time spent by the professionals on the various tasks to be performed."  <u>Jefsaba</u>, 172 B.R. at 798.  Excessive or unnecessary time is not compensable.  <u>Id.</u>  In addition, the services performed should provide a benefit to the estate.  <u>Id.</u>

30

Many of the "emergency" motions were routine motions where counsel for the Debtors were aware of looming deadlines well in advance of the filing of the motions.  We can conceive of no excuse for this.  At any rate, the estate should not have to pay attorneys' fees for the unnecessary time spent preparing and filing a motion to shorten notice necessitated by counsel's failure to act timely.  Thus, we intend to disallow fees associated with preparing the motions to shorten notice.  A detail of the amount of time spent by counsel on such motions should be filed within thirty days.

We also note that local counsel for the Debtors has requested paralegal fees for monitoring the docket and maintaining the calendar in this case (which presumably means assuring that counsel is aware of deadlines that are approaching).  This system, though costly, was not effective. Therefore, we are inclined to reduce fees for this category and direct that counsel advise how much time and fees were expended for this category.

### k.   Conflicts of Interest

In its Supplemental Affidavit filed December 1, 2003, Pachulski states it took the lead role in defending the Debtors in litigation involving Sara Lee when Kirkland became conflicted approximately one month after the litigation began.  The potential conflict of interest with Sara Lee, however, was not

disclosed in Kirkland's Retention Application nor any
Supplemental Affidavit filed by it.  Since this may warrant
disallowance of Kirkland's fees, we will require Kirkland to
present additional information regarding this conflict.  See,
e.g., In re BH & P Inc., (103 B.R. 556, 566 (Bankr. D. N.J.
1989)("A professional who serves conflicting interests in a
bankruptcy case may be denied compensation"), aff'd, 949 F.2d
1300, 1317-18 (3d Cir. 1991).

  C. Other Professionals Whose Fees We Intend to Cut

  Rider Bennett LLP ("Bennett"), special labor relations and
business litigation counsel for Debtors, charged seventeen cents
per copy, which fails to comply with Local Rule 2016-2(e)(iii),
which caps copy costs at fifteen cents.  Therefore, their copying
charges will be reduced to $156.02.  Bennett should submit a
proposed form of order reflecting this reduction.

  Pricewaterhouse Coopers LLP ("PwC"), forensic accountants
for the Board of Directors of the Debtors, filed a fee
application requesting approximately $1.25 million.  The UST
objected and argued that the fee application contained vague time
entries and that the amount requested was in excess of the amount
PcW had estimated in their Retention Application ($500,000).  On
October 14, 2003, PwC filed a Supplement to their First Quarterly
fee application.  In the Supplement, PcW revised time entries and
reduced the requested fees by $9,677.50 and expenses by $130.00.

We will not decide the matter at this time, as it is not clear whether the Supplement resolves the UST's objection.  Therefore, we will allow the parties to present evidence on this application at the fee hearing.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, we intend to reduce the fees requested by the Debtors' professionals.  The interim fees requested by the professionals not affected by this ruling have been approved by separate Orders.  A hearing will be held on February 10, 2004, at 9:30 am at which time the affected professionals may present evidence to support their interim fee requests.  Within thirty days of this Order, the professionals should file a report detailing the amount of hours and fees requested by them for the categories of disallowances identified above.  The UST should also file a report or further objections within thirty days.

An appropriate Order is attached.

BY THE COURT:

Dated: December 23, 2003

Mary F. Walrath
United States Bankruptcy Judge