IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**JOINT REPORT OF KIRKLAND & ELLIS LLP AND PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C. IN RESPONSE TO COURT'S OPINION REGARDING FIRST QUARTERLY INTERIM APPLICATIONS FOR PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES**

KIRKLAND & ELLIS LLP
James H. M. Sprayregen, P.C. (ARDC No. 6190206)
Richard L. Wynne (CA Bar No. 120349)
Eric C. Liebeler (CA Bar No. 149504)
Geoffrey A. Richards (ARDC No. 6230120)
777 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
Ira D. Kharasch (CA Bar No. 109084)
Scotta E. McFarland (Bar No. 4184)
Christopher J. Lhulier (Bar No. 3850)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier No. 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

Dated: January 22, 2004

---

[1] The Debtors are the following entities: Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark International, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; E.A. Morris Distributors, Ltd.; FAVAR Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc. (collectively, the "Debtors").

## TABLE OF CONTENTS

1.    Counsel's Response To Specific Information Requests. ....................................................4

    A.    Time Spent At Hearings And Travel Expense Information. ...................................4

    B.    Information On Intra-Office Conferencing. .........................................................5

    C.    Information on K&E's Bankruptcy Rates ............................................................6

    D.    Information On Cash Management/DSD TRO Fees...............................................7

    E.    Information On Reclamation-Related Fees ...........................................................7

    F.    Information On Fees For Motions To Shorten Time .............................................7

    G.    Information On Docket & Calendar Fees .............................................................8

    H.    Information On Sara Lee Conflict.........................................................................8

    I.    Information On DEC Investments..........................................................................8

    J.    Rejection Of Leases ..............................................................................................8

    K.    Modification Of Pleadings ...................................................................................9

    L.    Omnibus Hearing Dates .......................................................................................9

    M.    Bar Date Order .....................................................................................................9

    N.    Copy Costs ............................................................................................................9

2.    Analysis Of Specific Issues Raised By The United States Trustee.....................................9

    A.    Numerous Counsel For Debtors............................................................................9

    B.    Rate Issues..........................................................................................................10

    C.    Conferencing ......................................................................................................10

3.    Analysis Of Specific Issues Raised By The Court............................................................11

    A.    Introduction ........................................................................................................11

    B.    Cash Management Order......................................................................................12

    C.    DEC Investments Motion....................................................................................13

    D.    Lease Rejection. ..................................................................................................14

E.      Modification Of Pleadings. .................................................. 16

F.      Omnibus Hearing Dates. .................................................... 16

G.      Reclamation Procedures. ................................................... 17

H.      Bar Date Orders. ............................................................ 19

I.      Motion To Reduce Reserve. ............................................... 20

J.      Copy Charges. ............................................................... 22

K.      Motions To Shorten Notice. ............................................... 23

L.      Conflicts Of Interest. ...................................................... 23

4.    K&E's Response To The Court's Rate Analysis:  K&E's Requested Rates Are
      Reasonable Under The Controlling Market-Based Test. .................................... 24

      A.      The Bankruptcy Code And Controlling Third Circuit Precedent
              Require The Reasonableness Of A Billing Rate To Be Determined
              By The Market For Comparable Legal Services. ................................. 25

              1.      According to the Plain Text of Section 330, the Sole Criterion for
                      Determining the Reasonableness of a Fee Applicant's Rate Is
                      the Market Rate for Comparable Lawyers. ................................ 25

              2.      The Leading Case in the Third Circuit, Busy Beaver, Follows
                      the Code's Market-Based Approach. ..................................... 27

              3.      Busy Beaver Sets Forth a Two-Pronged Test for Determining
                      What Is a Reasonable, Market-Based Rate. .............................. 29

              4.      The Portion Of Busy Beaver Relied On By This Court
                      Relates To Write-Offs For Inefficient Work, Not Billing Rates. ........ 31

      B.      The Evidence At The Hearing Will Show That K&E's Rates
              Are Comparable To The Market And To What K&E Charges
              For Similar Work Outside Of Chapter 11. ...................................... 33

              1.      The First Prong Of Busy Beaver:  Comparison To Equivalent
                      Practitioners. .......................................................... 34

              2.      The Second Prong of the Busy Beaver Test:  Comparison to
                      the Fee Applicant's Rate for Equivalent Clients ....................... 37

5.    PSZYJ&W's Response To The Court's Rate Analysis. .................................... 44

DOCS_DE:87505.3

A.      PSZYJ&W's Staffing And Hourly Rates -- Blended Or Otherwise -- Are
        Well Within Market Norms And Reasonable, Given The Tasks
        That The Debtors Asked PSZYJ&W To Perform...............................................44

    1.      Except In Extreme Cases, A Blended Rate Is Not A Meaningful
            Measure Of The Reasonableness Of Attorneys' Fees Incurred
             In Representing A Client................................................................................46

    2.      PSZYJ&W Is A National Law Firm Which Was Retained In
            These Cases Largely Because Of The Depth Of Its National
            Bankruptcy Resources And In Contemplation Of The Fact
            That Lawyers With A National Scope Of Practice Would
            Be Handling Substantive Matters....................................................................49

    3.      The Market Or Appropriate Blended Rate Of Co-Counsel In A
            Chapter 11 Mega-Case Is Largely Dependent Upon The Extent Of
            Responsibility The Co-Counsel Is Retained To Accept.
            PSZYJ&W's Blended Rate Is Reasonable, Given The
            Responsibilities It Has Been Given..................................................................53

TABLE OF CONTENTS ...............................................................................................i

DOCS_DE:87505.3

## TABLE OF AUTHORITIES

**Cases**

Bennett Funding Group, Inc.,
   213 B.R. 234 (Bankr. N.D.N.Y. 1997) ................................................................. 50

Blum v. Stenson,
   465 U.S. 886 (1984) ............................................................................................. 50

Granfinanciera, S.A. v. Nordberg,
   492 U.S. 33 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) ......................................... 20

In re AmeriServe Food Distrib. Inc.,
   00-00358 (PJW) (Bankr. D. Del. 2000) .......................................................... 35, 43

In re Ames Dep't Stores Inc.,
   76 F.3d 66 (2d Cir. 1996) ................................................................................. 2, 11

In re Atwell,
   148 B.R. 483 (Bankr. W.D. Ky. 1993) ................................................................ 50

In re Auto Parts Club, Inc.,
   211 B.R. 29 (B.A.P. 9th Cir. 1997) ...................................................................... 11

In re Beverly Crest Convalescent Hosp., Inc.,
   548 F.2d 817 (9th Cir. 1976) ............................................................................... 26

In re Busy Beaver Bldg. Ctrs., Inc.,
   19 F.3d 833 (3d Cir. 1994) ............... 26, 27, 28, 29, 30, 31, 32, 33, 34, 37, 38, 44, 46, 48

In re Cenargo Int'l, PLC,
   294 B.R. 571 (Bankr. S.D.N.Y. 2003) ................................................................ 11

In re Chiquita Brands Int'l, Inc.,
   01-18812 (Bankr. S.D. Ohio 2001) ................................................................. 35, 43

In re City Mattress, Inc.,
   174 B.R. 23 (Bankr. W.D.N.Y. 1994) ................................................................. 11

In re Continental Ill. Sec. Litig.,
   962 F.2d 566 (7th Cir. 1992) ............................................................................... 51

In re Dade Behring Holdings, Inc.,
   02-B-29021 (EOD) (Bankr. N.D. Ill. 2002) ....................................................... 43

In re EXDS, Inc.,
   301 B.R. 436 (Bankr. D. Del. 2003) ................................................................... 20

In re Gencor Indus., Inc.,
   286 B.R. 170 (Bankr. M.D. Fla. 2002) ............................................................... 51

In re Globe Holdings, Inc.,
    No. BK 01-70115-CMS-11, Bankr. N.D. Ala. Mar. 18, 2002).........................................34, 35

In re Harnischfeger Indus., Inc.,
    99-02171 (PJW) (Bankr. D. Del. 1999) ..............................................................................35, 43

In re Hillsborough Holdings,
    127 F.3d 1398 (11th Cir. 1997).................................................................................................34

In re HQ Global Holdings, Inc.,
    293 B.R. 839 (Bankr. D. Del. 2003) ........................................................................................20

In re Humphrey's Inc.,
    01-13742 (REG) (Bankr. N.D. Ill. 2001) ................................................................................43

In re Jefsaba, Inc.
    172 B.R. 786 (Bankr. E.D. Pa 1994).......................................................................................10

In re Kusler,
    224 B.R. 180 (Bankr. N.D. Okla. 1998) ..................................................................................33

In re Manoa Fin. Co.,
    853 F.2d 687 (9th Cir. 1988)...............................................................................................passim

In re McCombs,
    751 F.2d 286 (8th Cir. 1984)....................................................................................................26

In re Meronk,
    249 B.R. 208 (B.A.P. 9th Cir. 2000)........................................................................................29

In re Pain Clinic, Inc.,
    No. 96-25315 JKF, 2000 WL 134735, at 4-5 (Bankr. W.D. Pa. Feb. 3) ................................48

In re Port Royal Land & Timber Co.,
    924 F.2d 208 (11ᵗʰ Cir. 1991)..................................................................................................11

In re Quality Stores, Inc.,
    GG-0110662 (W.D. Mich. 2001)..............................................................................................43

In re Smith Tech. Corp.,
    No. Civ.A. 99-132 MMS, 1999 WL 1427681, at (D. Del. 1999 Dec. 23)................................11

In re Stations Holding Co., Inc.,
    02-10882 (MFW) ................................................................................................................35, 43

In re Teligent, Inc.,
    02-12974 (SMB) (Bankr. S.D.N.Y. 2001) ...............................................................................43

In re Temple Ret. Cmty., Inc.,
    97 B.R. 333 (Bankr. W.D. Tex. 1989) .....................................................................................33

In re Trans World Airlines, Inc.,
    01-00056 (PJW) (Bankr. D. Del. 2001) ...................................................................................43

In re UDC  Homes, Inc.,
   203 B.R. 218 (Bankr. D. Del. 1996) ................................................................................ 29, 38

In re United Artists Theatre Co.,
   00-3514 (JLR) (Bankr. D. Del. 2000) .............................................................................. 35, 43

In re W.R. Grace & Co.,
   01-01139 (JKF) (Bankr. D. Del. 2001) .................................................................................. 54

In re Wire Cloth Prod.,
   130 B.R. 798 (Bankr. N.D. Ill. 1991) ..................................................................................... 33

In re Zenith Elec. Corp.,
   99-02911 (MFW) (Bankr. D. Del. 1999) ................................................................................ 43

Jensen-Farley Pictures, Inc.,
   47 B.R. 978 (Bankr. D. Utah 1985) ........................................................................................ 50

Metro. Transp. Co.,
   107 B.R. 50 (E.D. Pa. 1989) ................................................................................................... 33

Pintlar Corp.,
   Nos. 93-02986, 93-02987, 1994 WL 704441, at (Bankr. D. Idaho Nov. 30) ......................... 50

Ursic v. Bethlehem Mines,
   719 F.2d 670 (3d Cir. 1983) .................................................................................................... 46

**Statutes**

11 U.S.C. § 330 ........................................................................................................................ 31

11 U.S.C. § 365(d)(3) ............................................................................................................... 56

11 U.S.C. § 330(a) .................................................................................................................... 48

1.      Let us be clear:  We have heard the Court.  With regard to the overall progress of these cases, we are dedicated to bringing them to a successful resolution while working as efficiently and consensually as possible and complying with the letter and spirit of the Court's directives.

2.      Did mistakes happen? Absolutely.  Were they willful and designed to frustrate the legitimate expectations of all concerned, or to make misrepresentations to the court or opposing counsel?  Absolutely not.  Counsel acknowledge there has been some inefficiency.  And despite what we believe are extenuating circumstances, counsel agree with some of the Court's criticisms:  There were, for example, too many emergency motions filed, and there undoubtedly were some inefficiencies in the manner in which the case was staffed.  The case has at times been uncoordinated, contentious and difficult.  Local practice has on occasion not been followed. We sincerely apologize.  Accordingly, counsel agree to reduce their first quarterly fee request in the following specific areas, totaling $401,338.06 (K&E) and $158,169.05 (PSZYJ&W):

| ITEMS LISTED BY THE COURT | FEES | |
| --- | --- | --- |
| | K&E | PSZYJ&W |
| Hearing Attendance | $30,804.00 | $4,405.50 |
| Expenses for Hearing Attendance | $17,713.93 | $0 |
| Intra-office Conferences | $80,612.88 | $13,501.35 |
| Cash Management Order | $12,300.00 | $0 |
| DSD Temporary Restraining Orders | $152,595.25 | $79,240.54 |
| Reclamation | $41,401.00 | $19,541.00 |
| Motions to Shorten Time | $1,129.50 | $789.25 |
| Docket and Calendar Fees | $0 | $971.13 |
| DEC Investment Matter | $0 | $30,772.75 |
| Lease Rejection Modification | $10,534.50 | $2,499.50 |

| ITEMS LISTED BY THE COURT | FEES | |
|---|---|---|
| | K&E | PSZYJ&W |
| Modification of Pleadings | $50,496.50 | $2,525.13 |
| Omnibus Hearing Dates | $0 | $270.00 |
| Canadian Bar Date | $3,750.50 | $942.00 |
| Copy Charges | $0 | $2,710.90 |
| **TOTAL** | **$401,338.06** | **$158,169.05** |

3.    At the same time, the Court's opinion raises very serious issues that affect the professional reputations of both firms -- which are far more significant to counsel than the economic impact of the Court's proposed fee reductions.[2] To that end, counsel will demonstrate the propriety and good faith of their substantive actions on behalf of the Debtors at the February 10 evidentiary hearing the Court has set.  In our view, the opinion does not correctly characterize counsel's motives or their actions, and in fact criticizes counsel for implementing proper client decisions that not only benefited the estates, but also enjoyed the support of major creditor constituencies.  We submit that the entire record and substantial evidence of what occurred **outside** the courtroom must and should bear on this Court's final conclusions. Regardless of that outcome, we assure the Court that going forward, we will rigorously examine each of our activities with the Court's opinion in mind.  We will act as efficiently as possible within the bounds of our obligations to our clients, and continue to act in the utmost good faith.[3]

---

[2] Although we have agreed to concede certain fees and expenses, we do not believe we have acted contrary to the best interest of the estates.  See  In re Ames Dept Stores, Inc., 76 F.3d 66, 69 (2d Cir. 1996).

[3] We also want the Court to know that we will not seek compensation for the effort required to respond to the Court's opinion and to conduct the evidentiary hearing on February 10.  The analysis, research, data gathering, and development of evidence in connection with this report have been substantial, complex, and inherently difficult to verify.  We will be prepared to supplement or revise this material should the Court so desire or in the event inadvertent errors are found.

2

4.    Without minimizing the appropriateness of the write-offs we have agreed to take, we ask the Court to consider the difficult circumstances of these cases. In the usual complex case, counsel has at least some time to prepare for a chapter filing, usually in conjunction with a client who has stable management and information systems. Here, K&E was brought in when Debtors' circumstances were already dire and a filing was just days away.

5.    K&E was hired on Monday, March 24, 2003 to assist in what was then believed to be an out of court restructuring. Over the next few days, Fleming's liquidity crisis worsened as vendors shortened credit terms and refused to send product. It quickly became clear that the Debtors could not make a bond payment due on April 1. The only option was a Chapter 11 filing under more than the usual distress. Turnover of management and restructuring professionals compounded these difficulties.

6.    A strategic consensus on reorganization options took months to emerge, as did efforts to stabilize the crisis both inside and out of court (for example, by successful efforts to reconcile 99% of the outstanding PACA claims, and reject hundreds of unprofitable leases). Now that the threat of wholesale liquidation has begun to recede, we believe that the ship has been largely righted, and the case headed for a successful outcome. While mistakes were made, we made a good-faith professional commitment to create a path towards a successful restructuring, notwithstanding daunting challenges.

7.    With regard to the Court's criticism of the substantive positions taken on behalf of the Debtors by counsel, we submit that these positions were taken in good faith, always with legal support and often with the support of major constituencies in the case. Many of the positions criticized by the Court generated significant benefits for the estates. And while reasonable minds may differ as to their outcome, counsel submit that their actions were never unreasonable or otherwise sanctionable. On other matters, we believe that the entire factual record -- much of which the Court has not seen -- supports compensation, as we explain in detail below.

3

8.      Finally, with regard to the rate issues raised by the Court, this report provides a substantive response in two areas. First, K&E shows that its rates are reasonable under the controlling market-based test. Second, PSZYJ&W's rate structure is fair because it has acted as far more than local counsel in these highly complex cases, justifying a rate structure closer to national firms instead of the Wilmington-only market the Court indicates.

9.      The Court ordered counsel to file "a report detailing the amount of hours and fees requested by them for the categories of disallowances identified above" within thirty days.[4]  (Op. at 33, 13).  What follows is the detailed information the Court's opinion requests.  We then briefly describe the evidence counsel intend to present at the February 10 hearing.  Finally, we respond to the Court's rate analysis.

1.      **Counsel's Response To Specific Information Requests.**[5]

   A.      **Time Spent At Hearings And Travel Expense Information.**

   **Court's Request (Op. at 9):** "We, therefore, will require that Kirkland and Pachulski identify the amount of time at any specific hearing that each attorney spent on the matters for which they bore responsibility.  In addition, the travel-related expenses sought by each firm should identify which attorney incurred the expenses and on which date."

   **Counsel's Response:**  Exhibit A shows a hearing-by-hearing summary of fees and costs related to K&E and PSZYJ&W hearing attendance.  Specifically, column 1 indicates that K&E attorneys billed a total of 205.1 hours ($105,090) and PSZYJ&W attorneys billed a total of 89.8

---

[4]  There is significant overlap between these categories:  counsel certainly conferred with one another, for example, about DSD TROs.  We have not yet been able to calculate the extent of this double-counting, but we believe it to be significant.

[5]  In response to the Court's request, K&E will demonstrate at the hearing that the survey K&E already submitted is properly representative of the blended rates of professionals appearing in this Court.  (See Op. 14 n.6.)  Similarly, PSZYJ&W will submit evidence responding to the Court's request for evidence consisting of a Wilmington, Delaware firm survey (See Op. at 14-15) at that hearing.

hours ($41,677.50) for hearing attendance during the first quarter. Column 2[6] shows that K&E

attorneys billed 70.3 hours ($30,803) either waiting after their direct involvement ended or

otherwise not participating directly. PSZYJ&W totals 8.9 hours ($4,405) in this regard.

The Court expresses concern over high costs for hearing attendance. See Op. at 8-9. The

Court goes on to state that "many travel expenses were unnecessary" and "should not be

allowed." Id. Accordingly, column 3 shows all costs associated with first quarter hearings,

including costs on fee applications filed after the first quarter. Column 3 reflects total K&E

travel expenses of $61,761.25 in connection with first quarter hearings, $53,194.97 of which is

specifically for attorney travel expenses. Similarly, column 3 shows PSZYJ&W travel expenses

in the amount of $23,026.28.[7]

### B.   Information On Intra-Office Conferencing.

**Court's Request (Op. at 11):** "However, the UST does not provide the total number of

time entries, which would allow us to assess the reasonableness of the intra-office conferencing.

We request additional detail from counsel for the Debtors and the UST on this point."

**Counsel's Response:** The UST found "more than 3,700" K&E time entries using

"confer." K&E searched its bills for all forms of the word "confer" and turned up 5,955 discrete

uses. When a biller's time on one day described multiple tasks, K&E counted each separate task

as one entry.[8] Counted in that manner, K&E's bills reflect 18,000 total time entries.

---

[6] Column 2 is necessarily an approximation. Attorneys who billed time for appearing at hearings were identified by reviewing first quarter billing statements and hearing transcripts. The summary of services was derived by reviewing billing statements, hearing transcripts and, when necessary, by consulting with the appropriate attorneys. The length of time that attorneys spent at hearings after their direct involvement ended was determined by reviewing hearing transcripts. Because those transcripts were not time stamped, we divided each hearing by the total number of transcript pages and thus estimated that each transcript page represents approximately 1.5 minutes. We counted the number of pages following the conclusion of a particular attorney's matter and multiplied by 1.5 for the amount of time billed after that attorney's involvement.

[7] The Court has calculated K&E's and PSZYJ&W's travel expenses for attending hearings in Wilmington at more than $100,000 (Op. 9). The aggregate amount counsel have identified based on their review of their fee applications is approximately $85,000. Counsel request guidance from the Court as to the way in which it calculated counsel's travel expenses so that we can reconcile the $15,000 difference.

[8] For example, a biller's time entry might read: "telephone conference with A. Jones re DIP issues (0.2); analyze objection to DIP motion (0.5); confer with A. Smith re same (0.3)." K&E counted this example as two instances of "confer" and as three total time entries.

5

To assist the Court's analysis of intra-office conferencing, we further broke conferencing data down into four categories: K&E Internal Conferences, K&E-PSZYJ&W Conferences, K&E-Client Conferences (e.g. one-on-one conferences with a client), and Other Conferences. The total number of intra-office conference entries (K&E internal plus K&E and PSZYJ&W) is 3,075, or slightly over 17% of K&E's total time entries, 12% of K&E's total billable hours and 13% of K&E's total fees billed.  See Ex. B.

PSZYJ&W used the same methodology to break down its conferencing data.  The total number of intra-office conference entries is 913, or just under 13% of PSZYJ&W's total time entries, 7% of total billable hours and 9% of total fees billed.  See Ex. C.

Notwithstanding counsel's belief that conferring is a critical element to advancing these cases, they recognize the Court's concern that the first quarter of these cases could have been handled more efficiently.  Therefore, K&E is prepared to reduce its fees for intra-office conferences (that is, conferences internal to K&E or between K&E and PSZYJ&W) by $80,612.88, or 10%.  Similarly, PSZYJ&W will reduce its fees for intra-office conferences by $13,501.35, or 10%.

### C.    Information on K&E's Bankruptcy Rates

**Court's Request (Op. at 12-13):**  "Thus, we conclude that the hourly rates of bankruptcy practitioners must be commensurate with the hourly rates charged by their peers in other practice areas. To assess this we will require that Kirkland provide a schedule of the hourly rates of all its attorneys and paralegals in all practice areas and offices."

**Counsel's Response:**  Exhibit D lists K&E's hourly rates for all billers in the firm, organized by partner, associate, of counsel, paralegal, and others.  Part 4 of this brief explains this exhibit and K&E's rates and various rate structures in detail.[9]

---

[9]  Exhibit D redacts the names of K&E billers other than the lawyers and paraprofessionals billing on any Fleming matter.  We do list class year, area of practice, and review year.  If the Court wishes to see an unredacted list, K&E respectfully asks permission to file that list under seal.

6

**D.     Information On Cash Management/DSD TRO Fees**

**Court's Request (Op. at 18):** "Counsel for the Debtors should provide a detail of the amount of time spent on this within thirty days of this ruling."

**Counsel's Response:** Exhibit E describes time spent by K&E on various cash management issues.[10] Exhibit F describes time spent by PSZYJ&W on constructive trust issues.

> K&E fees (cash management order only): $12,300.
>
> K&E fees (TROs only):  $152,595.25.
>
> K&E fees (all other DSD-related time):  $533,210.50.
>
> PSZYJ&W's fees (all constructive trust issues):  $337,731.50.[11]

**E.     Information On Reclamation-Related Fees**

**Court's Request (Op. at 24, 25):** "Within thirty days, counsel for the Debtors should provide a detail of the amount of time spent by them in preparing and prosecuting those Motions, and analyzing the reclamation claims."

**Counsel's Response:** K&E spent 151.9 hours ($30,396.00) on the two reclamation motions discussed by the Court and 26.4 hours ($11,005.00) on analyzing reclamation claims. See Ex. G. PSZYJ&W spent 41.1 hours ($11,822.00) on the two reclamation motions discussed by the Court and 18.2 hours ($7,719.00) on analysis of reclamation claims. See Ex. H. Both exhibits identify fees incurred through September 30, 2003 because the Court's opinion specifically addresses pleadings filed and work performed beyond the first quarterly fee period.

**F.     Information On Fees For Motions To Shorten Time**

**Court's Request (Op. at 31):** "A detail of the amount of time spent by counsel on [motions to shorten notice] should be filed within thirty days."

---

[10]   These exhibits identify fees incurred through November 30, 2003 since the Court's directive goes to fees incurred beyond June 30, 2003.

[11]  PSZYJ&W combined its time for cash management, TROs, and DSD issues into one category called "constructive trust."

**Counsel's Response:**

| | | |
|---|---|---|
| K&E Total: | 3.1 hours ($1,129.50) | |
| PSZYJ&W Total: | 9.3 hours ($3,157.00) | |
| Both Firms' Total: | 12.4 hours ($4,286.50) | |

See Ex. I.

### G.   Information On Docket & Calendar Fees

**Court's Request (Op. at 31):** "Therefore, we are inclined to reduce fees for this category and direct that counsel advise how much time and fees were expended for this category."

**Counsel's Response:** K&E time: 0 hours ($0); PSZYJ&W time: 56.70 hours ($7,357.00). See Ex. J.

### H.   Information On Sara Lee Conflict

**Court's Request (Op. at 32):** "Since this may warrant disallowance of Kirkland's fees, we will require Kirkland to present additional information regarding this conflict."

**Counsel's Response:** On April 10, K&E filed an affidavit in support of its retention application. That affidavit, from James H. M. Sprayregen, P.C., discloses K&E's relationship with Sara Lee. See Ex. K (Sprayregen Aff. at ¶ 8-9 & Ex. B at 3.). The entire affidavit is available for the Court's review at Docket No. 190.

### I.   Information On DEC Investments

K&E billed no time on the DEC Investments matter. PSZYJ&W billed 127.4 hours ($61,545.50) on the DEC Investments matter. See Ex. L.

### J.   Rejection Of Leases

K&E billed 30.1 hours ($10,534.50) to modify motions to reject leases during the first quarter. See Ex. M-1. PSZYJ&W billed 25.4 hours ($9,998.00) to modify lease rejection motions. See Ex. M-2.

8

### K.     Modification Of Pleadings

K&E billed 137.6 hours ($50,462.00) to modify two orders.  See Ex. N-1.  PSZYJ&W

billed 37.8 hours ($10,100.50) to modify pleadings.  See Ex. N-2.

### L.     Omnibus Hearing Dates

K&E billed no time to correct omnibus hearing dates.  PSZYJ&W billed 1.5 hours

($270.00) to do so.  See Ex. O.

### M.     Bar Date Order

K&E billed 8.5 hours ($3750.50) on the Canadian bar date orders.  PSZYJ&W billed 2.2

hours ($942.00) on the Canadian bar date orders.  See Exs. P-1 and P-2.

### N.     Copy Costs

K&E incurred no copy costs for chambers binders.  PSZYJ&W incurred $8,632.00 in

fees and $2,211.60 in costs related to hearing binders.  See Ex. Q.

## 2.     Analysis Of Specific Issues Raised By The United States Trustee

### A.     Numerous Counsel For Debtors

10.     The Court questions the need for multiple lawyers at hearings, and in particular

the attendance of both a senior and junior lawyer from PSZYJ&W at omnibus hearings.  The

Court states that it does not believe Laura Davis Jones' presence throughout each such hearing

was necessary unless she was handling a specific matter, and that the estates should not be

charged except for time spent by her on those specific matters. (Op. at 9.)

11.     PSZYJ&W respectfully disagrees.  This is the fifth largest Chapter 11 case in

history, and Ms. Jones is one of the most experienced practitioners in Wilmington and the

country in handling the substantive and procedural issues that arise in such cases.  It would be

inappropriate judgment if the duties assumed by Ms. Jones were delegated instead to junior

personnel, particularly in view of the dissatisfaction expressed by the Court.  Omnibus hearings

involving more than forty discrete matters cannot be coordinated by one lawyer -- at least not

well -- and often two was not enough to pay full attention to the Court, handle matters at the

podium, handle hallway negotiations, mark up orders, and coordinate and perform support

9

activities. Furthermore, PSZYJ&W is not acting purely as local counsel in these cases: It is co-lead counsel and Ms. Jones has had pervasive substantive responsibilities throughout these hearings.[12] She would not be able to fulfill either her substantive or procedural role adequately if she were diverted from the proceedings by the multitude of coordination tasks handled by Mr. Lhulier, a fifth-year associate, at the omnibus hearings.[13] Both lawyers' attendance at such hearings is necessary to maintain the level of organization that the Court expects.

### B.    Rate Issues.

12.    The Court and the United States Trustee raise issues with the overall billing rates of both firms. Sections 4 and 5 of this brief respond to those concerns.

### C.    Conferencing

13.    K&E and PSZYJW's internal conferences are essential not only to the smooth administration of these cases, but also to advancing the big-picture goal of emerging from bankruptcy quickly. It is well established that intra-office conferences are compensable to enable attorneys to exchange ideas, evaluate strategies, pool skills, and to ensure that duplication of work is avoided. Intra-office conferencing is particularly key to discuss the status of various matters in a large and complicated bankruptcy. And when the "normal requirements of specificity ... and reasonableness" are satisfied, "[a]ll participants may bill for the time spent in the intra office conferences." In re Jefsaba, Inc., 172 B.R. 786, 800 (Bankr. E.D. Pa 1994).

14.    Counsel submit that the percentage of intra-office conferences of the total time entries for K&E and PSZYJW is within the range of reasonableness that can be expected of cases this large and this complex. It would be impossible for the Debtors' counsel to administer these

---

[12]    Ms. Jones has had a substantive role at each hearing, including issues related to the Debtors' employees, critical trade vendors, cash management, executory contracts and unexpired leases, utilities, the automatic stay, administrative claims, financing, asset sales, tax payments, scheduling, equity securities trading, intervention in adversaries, professional employment, and cross-border protocols.

[13]    Mr. Lhulier has also had an active role at omnibus hearings, preparing and presenting orders; revising orders during the hearings as needed; conferring with opposing counsel to resolve outstanding issues on agenda items; and communicating with the Clerk, chambers, the client, K&E attorneys and staff, and PSZYJ&W attorneys and staff to obtain additional information and materials required throughout the course of the hearings.

cases without frequently conferring with one another to discuss case strategy, resolve disputes with multiple constituents, respond to client inquiries and develop solutions to the hundreds of objections filed in these cases.

**3.      Analysis Of Specific Issues Raised By The Court**

      **A.      Introduction**

      15.    Although the Court believes counsel took positions that were wrong, we contend that our actions were reasonably intended to benefit the estates. We articulate the legal standard applicable to fee reductions, and then preview the evidence we intend to present at the hearing.

      16.    Counsel's fees should not be disallowed if, at the time the services were rendered, they were reasonably likely to benefit the estate. In re Smith Tech. Corp., 1999 WL 1427681, at *6 (D. Del.); see, e.g., In re Auto Parts Club, Inc., 211 B.R. 29, 35 (B.A.P. 9th Cir. 1997) ("the standard is an objective one as to whether the fees were reasonable and necessary at the time they were incurred"); In re City Mattress, Inc., 174 B.R. 23, 26 (Bankr. W.D.N.Y. 1994) ("The key issue is whether the services were necessary, not whether the debtor's activities were, in hindsight, necessary to achieve whatever outcome eventually occurs."). If a court is considering a fee reduction, "the Court must conduct an objective inquiry 'based upon what services a reasonable lawyer or legal firm would have performed in the same circumstances.'" In re Cenargo Int'l, PLC, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003) (quoting In re Ames Dep't Stores Inc., 76 F.3d 66, 72 (2d Cir. 1996)).

      17.    The Bankruptcy Code is not a fee-shifting statute. In re UNR Indus, Inc., 986 F.2d 207, 210 (7th Cir. 1993). Unsuccessful litigation does not warrant a reduction in fees. See In re Port Royal Land & Timber Co., 924 F.2d 208 (11th Cir. 1991) (reversing lower court's decision to deny fees based on unsuccessful fraudulent conveyance litigation); accord In re Manoa Finance, 853 F.2d 687, 691 (9th Cir. 1988). The outcome of litigation pursued by debtor's counsel is largely irrelevant to whether the related fees are permitted under section 330. See Ames, 76 F.3d at 71-72. In Ames, the Second Circuit reversed the lower court's fee disallowance. In so doing, the panel held that the proper test for a bankruptcy court to apply

11

when determining whether fees are appropriate under section 330(a) is whether counsel's services are reasonably likely to benefit the debtor's estate at the time the services are rendered, not whether counsel is able to show, in hindsight, actual benefit to the estate. See id. at 72. This standard applies to each of the substantive analyses that follow.

### B.     Cash Management Order.

18.     Debtors' counsel respectfully submit that the disagreement regarding the intent, scope and impact of this order is an honest one.  During the April 3 first-day hearings, Debtors' counsel sought a cash management order to avoid the chaos that would have resulted from shutting more than 200 accounts located at 15 financial institutions throughout the country, which collectively handled more than $270 million of invoice transactions every week.  At that time, several creditors told Debtors' counsel that the Debtors were acting as their paying or collection agent and that funds in the Debtors' possession belonged to them, not the estates.  To avoid a dispute between these creditors and the Debtors' secured lenders, Debtors' counsel agreed to interlineate the Debtors' draft order in the middle of the hearing.  Debtors' counsel agreed to do so to acknowledge that any cash in the Debtors' possession which was not property of the estates would not be used by the Debtors.  At the same time, Debtors' counsel did not intend to give up the right to contest the agency claims of any individual creditor.

19.     Debtors' counsel submit that the cash management order simply cannot require the Debtors to segregate millions of dollars based only on creditors' assertions that the Debtors acted as their agent.  Otherwise, the cash management order rewards an unknown universe of creditors, with unknown claims, with the equivalent of prejudgment attachment with no evidentiary showing whatsoever.  Debtors' counsel neither intended nor believed the order was intended to shift the burden of proof to the Debtors and require them to prove a negative -- that is, that cash collected post-petition is **not** someone else's property.

20.     At several hearings, the Court seemed to agree with Debtors' counsel, ruling that only those creditors who had sought a temporary restraining order and had carried their burden of showing a likelihood of success on their constructive trust claims were entitled to have cash

12

escrowed.  Moreover, even though these trust claimants sought an escrow amount of $30 million, the Court has only ordered the Debtors to escrow approximately half that amount.[14]  After counsel litigated the Sara Lee TRO, Sara Lee materially reduced its settlement demand.  The Debtors respectively contend that litigating these TROs has benefited the estate, as we will explain further at the hearing.

C.      **DEC Investments Motion.**

21.     Counsel respectfully submit that the Court's characterization that counsel insisted on discovery and trial, only to concede, is simply not correct.  At issue was both the Debtors' proposed rejection of the lease and DEC's assertion of a large administrative rent claim.  DEC not only sought monetary damages in excess of $1 million, but also asked the Court to require as a condition to reject of DEC's lease that the Debtors restore the property to its original condition -- including a specific performance order to undo structural changes and modify public highway access to the property.  Whatever the burden was of complying with such an order -- and it was uncertain the Debtors could even obtain the requisite transportation authority permits irrespective of such burden -- it was very clear that it would be cost-prohibitive for the Debtors to comply with similar orders on any significant number of the Debtors' other one thousand-plus leases.  Losing that portion of the DEC litigation could have forced a wholesale liquidation.  At the hearing, the Court adopted the Debtors' position on this crucial issue, a litigation outcome that was a substantial benefit to the estates.

22.     The chief factual issues at trial concerned the date of surrender of the premises (a key part of DEC's substantial damage claims) and the roof repairs.  The Debtors conceded neither.  While the Court's concern over time spent on DEC's "punch-list" of specific items is understandable, it was DEC that introduced it, it had not been produced until the day of trial, and Debtors' cross-examination of it comprised only 1.5% (five pages) of the transcript.  The trial is

---

[14]   Had the Debtors not litigated those claims, the dollar value of constructive trust claims would likely have risen substantially, forcing an escrow with which the Debtors might not have been able to comply.  5/6/03 Tr. at 94-95 (Mr. Werb, for class plaintiffs, articulating $150 million potential constructive trust claim).

not fairly characterized as a waste of time and the Court did not express any such view at the time.[15]

### D.    Lease Rejection.

23.    As of the petition date, the Debtors' 1,500-plus real estate leases and subleases cost the estates more than $28 million each month.  A number of the leased premises were vacant; others were subsidized by the Debtors.  And still others were considerably above-market.

24.    In an effort to improve customer fill rates and curtail the Debtors' operating costs, counsel worked with the Debtors to promptly identify leases that were no longer valuable to the estates.  In addition to seeking immediate rejection of more than one hundred leases in the first few days of the cases, counsel worked with the Debtors to devise a real estate rejection procedure that enabled the Debtors to reject leases on 10 days' notice to lease counterparties. The Debtors sought to implement these procedures to avoid having to wait at least 18 days (or longer, depending on the next omnibus hearing date) and incur hundreds of thousands of dollars in unnecessary administrative obligations until the Debtors could reject leases.

25.    Counsel sought this Court's approval of lease rejection procedures on terms similar to other procedures that were approved in these cases (such as sale of de minimis assets, sale of real estate, sale of excess and obsolete inventory) as well as rejection procedures that had been approved by this and other courts in this district.  See, e.g., In re Bonus Stores, Inc., Case No. 03-12284 (Walrath, J.) [D.I. Nos. 100 and 101] (rejection effective upon later of (1) seventh day after notice of rejection served; (2) date the debtor vacates premises; or (3) date of entry of court order resolving an objection to rejection notice);  In re HomeLife Corp., Case No. 01-02412 (Kornreich, J.) [D.I. No. 489] (five calendar days' notice; lease rejected effective as of the notice date); In re Pryor/eTrain Holdings, Case No. 01-02500 (Farnan, J.) [D.I. No. 217] (if no objection received within 10 days, lease is rejected effective as of the notice date); In re Zainy

---

[15]    In reviewing the August 26, 2003, hearing transcript, while the Court did express some exasperation at the punch-list testimony, counsel cannot locate any colloquy in which the Court questioned the necessity of the trial, or any response by counsel that its point was to require DEC to meet its burden of proof. See Op. at 19.

Brainy, Inc., Case No. 01-1749 (Robinson, J./Walrath, J.) [D.I. No. 678] (seven business days' notice; lease rejected effective as of the notice date); In re W.R. Grace & Co., Case No. 01-01139 (Fitzgerald, J.) [D.I. No. 34] (if no objection received within 10 days, lease is rejected as of notice date); In re MBC Greenhouse Co., Case No. 01-02175 (McKelvie, J.) [D.I. No. 8]; In re Advanced Radio Telecom, Corp., Case No. 01-1511 (Farnan, J./Walrath, J.) [D.I. No. 13] (if no objection received within 15 days, lease is rejected effective as of the notice date).

26.     Counsel fully recognize the Court's frustration with counsel regarding the lease rejection motion filed on July 2, 2003 [D.I. No. 1817] since it appears that counsel did not follow the Court's order to comply with Local Rule notice requirements.  (Op. at 20.)  But because the July 2nd rejection motion was served via hand and overnight mail on all affected parties, we believe the motion complied with the rules:  counsel set it for hearing on July 17, 2003, fifteen days after service.  Bankr. D. Del. L.R. 9006-1(c) requires service fifteen days prior to the hearing date, or eighteen days prior to the hearing date if service is by regular mail.  Similarly, the motion set the proper deadline for objections: July 10, seven days before the July 17 hearing. Bankr. D. Del. L.R. 9006-1(c) requires that objections be filed and served so as to be received at least five business days before the hearing date.

27.     Counsel acknowledge that there have been instances involving the addition or deletion of leases to a lease rejection motion.  But counsel suggest that the decision to add or delete leases was the function of the Debtors' exercise of their business judgment and not hardball litigation.  Given the speed with which these Debtors fell into Chapter 11 and the significant loss of personnel that the Debtors' real estate group experienced both before and after the petition date, the Debtors' overtaxed employees worked as diligently as possible to identify leases that should be rejected.  In some instances, the wrong lease was included in a rejection motion.  In other instances, the right lease was not included in such a motion.  In all instances, however, the Debtors and counsel proceeded in a good faith effort to protect the interests of these estates and the Debtors' creditors.

28.      Moreover, a number of the changes to lease rejection motions relate to those leases designated by the purchasers of the Debtors' wholesale grocery division.  On several occasions, after the Debtors filed a motion to reject leases pursuant to an instruction from a purchaser, but before the hearing, the purchaser informed the Debtors that it no longer wished to reject a particular lease and instructed the Debtors to remove that lease from the motion.  To comply with their obligations under the wholesale division purchase agreement, the Debtors were obligated to attempt to comply with these directions.

### E.      Modification Of Pleadings.

29.      After reviewing the docket covering the first quarterly fee period, counsel have identified only a few motions to modify prior motions or prior court orders.  Other than modifications to lease rejection motions and reclamation procedures, each of which is discussed separately, the only modified pleadings we found relate to motions to modify orders of the Court (such as the order approving customer programs and the payment of wages and benefits).  In each case, the modification sought to expand the scope of the Court's orders in an effort to, for example, honor limited prepetition claims to stimulate customer support, or to try to provide additional benefits to current and former employees.  We believe there was nothing improper in seeking those modifications.

### F.      Omnibus Hearing Dates.

30.      After obtaining omnibus hearing dates for September 4, through December 23, 2003, PSZYJ&W promptly filed a certification of counsel and proposed order with the Clerk of the Court, but neglected to deliver a copy to chambers, as required by the local rules, until contacted by chambers on September 30, 2003.  The firm apologizes for this error.  It trains its paralegals to send orders to chambers; in this instance, the paralegal simply forgot.  The firm has adjusted its compensation request accordingly.

31.      The Court states that it "is unable to ascertain whether counsel's failure was through inadvertence or for a more nefarious purpose." (Op. at 23.)  No nefarious purpose was intended.  As the Court notes, PSZYJ&W filed the certification and proposed order with the

16

Clerk on July 14, shortly after obtaining the hearing dates.  But the Court's opinion does not say that PSZYJ&W *served them at that time* on all parties that had requested special notice in these cases (a 33-page list).  Further, all documents posted on the docket are available to the public over the Internet.  While the firm erred, it certainly did not try to, and indeed did not, keep hearing dates secret.

### G.    Reclamation Procedures.

32.    Although the factual history of the Debtors' reclamation procedures is complex, the Debtors believe each step was justified.  More importantly, the Debtors believe the Court may be operating on a mistaken factual premise.

33.    The Court approved a reclamation reconciliation process on April 22.  [D.I. No. 8].  That order required reclamation claimants to submit claim details, and ordered the Debtors to analyze those claims.  Because of immense difficulties on both sides (by claimants, in supporting their claims, and by Debtors, in reconciling them), the Debtors filed another reclamation procedures motion on July 21.[16]  The July 21 motion included a substantially detailed report.  That report contained a comprehensive summary of nine analysis categories, including a creditor-by-creditor analysis of the dollar value of reclaimed goods **not** in the Debtors' possession on the pertinent demand dates.[17]  [D.I. No. 2050].  Despite the implicit agreement of the Creditors' Committee, a number of other reclamation creditors objected to the July 21 motion.  To try and resolve those objections, the Debtors tabled their July 21 motion.  Thus, the Court would have no reason to look at the detailed report that motion contained.

34.    After negotiation with the Ad Hoc Reclamation Committee,[18] the Debtors filed a new procedures motion in September.  The Ad Hoc Committee saw, negotiated, and specifically

---

[16]    Before filing it on July 21, the Debtors provided that motion to the Creditors' Committee, who offered no comments to it and never objected.

[17]    At the same time, the Debtors sent detailed customized information packets to each reclaiming creditor.

[18]    Approval of the Ad Hoc Committee is not, of course, binding on all reclamation creditors.  But we make the point here to demonstrate that we negotiated with reclamation creditors in good faith -- and did not do so, as the Court's opinion suggests, to prejudice them.

17

approved the Debtors' September motion.[19]  However, that motion did not contain the detailed report the Debtors had completed in July.  Thus, when the Court denied the September motion at a hearing on October 2, we do not believe the Court was aware of the detailed report filed in July but tabled in the interim -- nor would the Court have known that the Debtors had sent the detailed reclamation packages to each reclamation creditor.

35.     We submit that the Court is therefore (understandably) not correct to say that the Debtors' report "contained little more than a summary of what claims were filed, with no analysis and no indication of what goods the Debtors had on hand as of petition date." (Op. at 24.)  True enough, insofar as the **September** motion goes.  But the Debtors did analyze the claims, and indicated what goods were where.  The Debtors filed that analysis on July 21.

36.     The Court also criticizes counsel for recently filing a motion claiming that secured lenders' liens defeat reclamation claimants' rights.  If so, the Court argues, then the detailed factual analysis of reclamation claims is of no value to the estates -- and likewise forced the reclamation claimants to conduct a useless factual analysis.  Counsel contend that a detailed factual analysis of reclamation claims was necessary no matter what, for several reasons.

37.     First, the Court's April 22 order required it.  Second, reclamation creditors demanded it.  And third, no negotiated resolution of the reclaiming creditors' claims could be done without it, either on a standalone basis or in conjunction with preference claims, offsets, vendor deductions, or other related claims of the 616 reclaiming creditors.  Although there has as yet been no consensual resolution, the parties are trying to do so -- but without that factual analysis, they could not even try.

38.     More significantly, the Debtors did not know whether their legal position vis-à-vis reclamation creditors would prevail, nor even what position to take until the cases had matured to plan negotiations.  A failure of the Debtors' reorganization efforts, for example, would have

---

[19]  The entire purpose of the September motion was to give those creditors who had failed to support their claims more time to establish their claims before the Debtors sought to disallow them.  That motion, far from being a delaying tactic to harm reclaiming creditors, was done **for their benefit.**

resulted in a liquidation sale, and nothing for reclamation claimants. The Debtors could not decide the appropriate treatment to propose for reclamation creditors until the Debtors and Creditors Committee began plan negotiations and related analysis. Moreover, the Debtors' conclusions on the value of secured liens could also be wrong (although we don't believe so), and the Court could determine that reclamation creditors are entitled to liens or administrative priority claims.

39.     To propose a confirmable plan, the Debtors therefore needed to estimate the range of outcomes for reclamation claims. Waiting for a legal ruling to begin the factual analysis would therefore have unreasonably and possibly fatally delayed confirmation of a plan. We believed then and now that it would have been irresponsible to wait to develop the facts, even if the Debtors had decided to assert a position earlier. Even now, it remains unclear when that legal issue will be resolved.

40.     At the same time, Debtors' counsel made no secret of their argument that the secured lenders' lien rights might well eviscerate the reclamation claims. The Debtors' initial reclamation motion disclosed that argument, as did this Court's signed April 22 order:

> The Debtors reserve the right to object to any reclamation claim on any grounds, including the ground that reclamation claims are subject to any secured creditor's liens and that the debt secured by such liens exceeds the value of the goods subject to the reclamation claim, . . . .

[D.I. No. 559.]

41.     Moreover, the Debtors' July 21 motion and reclamation report clearly disclose that same legal argument. [D.I. No. 2050 at ¶ 17, 20]. There was no surprise. There was no sandbagging.

### H.     Bar Date Orders.

42.     Although counsel appreciate the Court's frustration concerning the Canadian bar date order, we believe this is caused by a failure of communication. Again, we apologize. We respectfully contend that the order K&E submitted in fact complies with the order Judge Tysoe issued from the Supreme Court of British Columbia.

43.     Judge Tysoe's order applies only to the Canadian proceedings involving the Canadian operations of Core-Mark International, Inc ("Core-Mark Canada"). Judge Tysoe certainly has jurisdiction over the Canadian creditors of Core-Mark Canada; at the same time, however, this Court has jurisdiction over Canadian creditors who assert claims against United States Debtors.

44.     The draft orders K&E submitted sought to preserve this Court's jurisdiction over Canadian creditors of domestic Debtors, and to comply with Supreme Court precedent and the law of this Circuit. See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 58-59, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (foreign creditor submits to the jurisdiction of a United States bankruptcy court upon the filing of a proof of claim here); In re EXDS, Inc., 301 B.R. 436, 439 (Bankr. D. Del. 2003); In re HQ Global Holdings, Inc., 293 B.R. 839, 841 (Bankr. D. Del. 2003). This Court's order, however, deleted the words "to the extent such claim is based on Core-Mark's Canadian Operations." See [D.I. No. 3424]. There was no intent to deceive Canadian creditors or anyone else.

## I.    Motion To Reduce Reserve.

45.     The Court reprimands counsel for "inappropriate litigation tactics" relating to the sale of the Debtors' wholesale grocery division to C&S. (Op. at 26.) Given the Court's criticism, it is apparent that we have not provided the Court with a sufficiently clear explanation of the C&S purchase agreement or why the Debtors needed to identify potential cure costs under the original purchase agreement before consummating the C&S sale.

46.     The terms of the initial C&S purchase agreement required the Debtors to pay all cure costs. The Debtors had tried to shift this exposure to C&S during their negotiations of the purchase agreement. Ultimately, if $22 million of cure claims were asserted, the Debtors could terminate the agreement. Although the Debtors' books and records identified approximately $11 million as the total cure amount for all of the more than 5,000 contracts and 1,000 real estate leases relating to the wholesale business, the Debtors needed to confirm that counterparties did not assert potential cure costs that materially exceeded $22 million. Without a clear

understanding of the potential cure costs, neither the secured lenders nor the Creditors Committee would support the sale; nor would the Debtors proceed with the sale.

47.     The Debtors' concerns were well justified, since more than 400 cure objections asserting more than $200 million in cure claims were filed. The vast majority of these cure objections were by customers who asserted both consequential and direct damages that the Debtors had absolutely no way of determining. Yet, all but two of the objecting customer parties had affirmatively waived consequential damages in their facility standby agreements with the Debtors. See Declaration of Louis J. Price at ¶ 4, found at Ex. B to D.I. No. 2594.

48.     The Court declined to enforce the consequential damage waiver provisions without a trial on each separate objecting party's contract notwithstanding the unambiguous language in each contract and uncontroverted case law that supports the enforceability of the provisions. The Debtors had neither the time nor the liquidity for a protracted legal battle and C&S refused to postpone the sale until all of the cure issues were fully resolved. The Debtors and K&E swiftly negotiated a $30 million purchase price reduction which funded cure costs. In exchange, C&S agreed to pay any cure claims in excess of this amount. As a result of this revised sale term, the Debtors have given C&S and other purchasers $30 million of the Debtors' funds with which to settle cure disputes, which is probably why the Court has heard so few cure disputes between purchasers under the purchase agreement and contract counterparties.

49.     The Debtors' subsequent requests for hearing continuances did not relate to the determination of cure amounts, but rather to the Debtors' motion to reduce the adequate protection reserve that had been established to protect certain parties' offset rights in connection with the sale hearing. The Debtors requested continuances on several occasions, including October 2, because of the Debtors' and C&S's successful efforts in resolving the objections to the Debtors' request to reduce the reserve. Ultimately, the Debtors resolved all of these objections, enabling the Debtors to reduce the adequate protection reserve by approximately $40 million.

21

50.    The Court is "inclined to reduce" fees for this issue, (Op. at 28), but the Court's order does not identify particular tasks for which it suggests a fee reduction. We note that the great majority of this work occurred in the second quarter. Counsel respectfully ask the Court for further guidance on this issue.

**J.    Copy Charges.**

51.    PSZYJ&W apologizes for including excess documents in the omnibus hearing binders. Preparing binders for an omnibus hearing in a case of this size is a surprisingly difficult task and is a common source of frustration for judges and attorneys alike. There is no Local Rule and each chambers has its own procedures.[20] PSZYJ&W instructs its staff on what each chambers requires in its hearing binders, but mistakes are inevitable. To cut costs, PSZYJ&W reuses old binders, and so cannot review them. It can surmise, however, why certain service lists, related pleadings and objections were included.[21]

52.    The Court cites as an example four binders at the November 4 hearing that it states contained pleadings relating to matters listed as continued. (Op. at 29.) Counsel reviewed those binders and determined that they included only documents regarding uncontested matters and "resolved matters" that were going forward that day. Unless directed otherwise, PSZYJ&W understands these to be properly included, and they have been included and accepted since that time.

---

[20]   Chambers procedures are very brief and can vary substantially. This Court wants its binders to have the "Notice of Agenda, along with **unbound** copies of all documents listed as going forward" with "only the substantive documents necessary for the hearing" and no service lists unless they are at issue. Judge Walsh's procedures address what to include in CNO binders only. Judge Fitzgerald's procedures contain no direction as to the contents of binders. The procedures of Judges Carey and Newsome say only "Agendas and binders, including all papers related to all agenda items shall be submitted...."

[21]   PSZYJ&W's staff is instructed to exclude service documents related to a substantive item on the agenda. Service documents are generally entered separately on the docket. Staff likely included them by mistake if they were part of the same docket number on the agenda. Counsel believe this error was corrected very early in the cases. PSZYJ&W reads chambers procedures to require inclusion of substantive "related documents" for matters going forward, whether or not resolved. It was unaware of any directive to the contrary and believed it better to err on the side of inclusion. It will now do otherwise. Finally, PSZYJ&W includes all objections to motions that are scheduled to go forward, even if such objections have been resolved, unless the objection has been withdrawn or ruled upon. PSZYJ&W sought to conform to the direction in the January 2003 Bench and Bar Meeting handout that counsel not include objections that have been continued from hearing to hearing. Due to the large number of agenda items and objections, however, some may have been included in error.

**K.      Motions To Shorten Notice.**

53.      The Debtors hired K&E just three days before they all but ran out of liquidity. Four days later, the Debtors filed the fifth largest bankruptcy case in history. The Debtors were immediately besieged by an avalanche of complications that no company is ever fully prepared for, especially one that had virtually no time to prepare for their $17 billion free-fall into Chapter 11. Counsel's singular focus in the first few days of these cases was triage -- to stabilize the Debtors as quickly as possible to prevent the complete liquidation of one of America's largest corporations.

54.      Counsel are familiar with the rule requiring ordinary notice of pleadings. But counsel respectfully submit these are extraordinary cases that required extraordinary relief in the first few weeks after the petition date. Like most other debtors, these Debtors initially were unaware of the time constraints imposed on them by the bankruptcy process. And it takes time for a large, decentralized organization that at one time employed more than 20,000 people to realize that Chapter 11 imposes particular notice requirements.

55.      As the threat of immediate liquidation subsided, so too did the need to file pleadings on shortened notice. Out of the 25 motions to shorten time filed in this case, ten were in the first month, six in the next two months and just seven in the past six months. And the Court seemed to understand the Debtors' plight and recognize the Debtors' need for urgent relief early on, as it denied just one of these sixteen requests in the first three months of these cases.

**L.      Conflicts Of Interest.**

56.      The Court asserts that K&E failed to disclose its connection with creditor Sara Lee. (Op. 31-32.) However, K&E disclosed that connection on April 10, in conjunction with its application to be retained *nunc pro tunc* to April 1 as Debtors' counsel. At that time, K&E filed an affidavit from James H.M. Sprayregen, P.C. [D.I. No. 190].

57.      Page three of attachment B to Mr. Sprayregen's affidavit clearly disclosed the Sara Lee conflict:

| Name of Entity Searched | Name of Entity and/or Affiliate of Entity that is a K&E Client | Brief Description of Representation |
|---|---|---|
| Sara Lee Corp. | Sara Lee Corp. | Representation in corporate and tax advisory matters unrelated to the Debtors. |
| Sara Lee Corp. | Donald Lee Meier and Judith Ellen Meier | Representation in estate planning matters unrelated to the Debtors. |

58.     That disclosure was adequate to provide interested parties with the opportunity to

object to K&E's employment if there was any concern about its connection to Sara Lee. Nobody

did so. And in circumstances when Sara Lee and others had common issues, K&E was careful to

step away from the representation **and** to notify the Court. See 5/01/03 Tr. at 11:17-21 (Mr.

Wynne: "[W]e're not appearing with respect to Sara Lee because . . . Sara Lee is a client of

Kirkland and Ellis so, I can respond generally. We can appear on the other matters. But for Sara

Lee, the Pachulski firm has handled all of that."); id. at 68:15-16 (Mr. Capozzola: "[I] think the

Sara Lee issue should be probably addressed by [PSZYJ&W lawyer] Mr. Brown); 5/27/03 Tr. at

16:24-25 (Mr. Liebeler: "None of the evidence that we're putting on goes to Sara Lee, that's

certain.").

**4.      K&E's Response To The Court's Rate Analysis:  K&E's Requested Rates Are Reasonable Under The Controlling Market-Based Test.**

59.     The Court ruled that the hourly rates of K&E bankruptcy petitioners "must be

commensurate with the hourly rates charged by their peers in other practice areas" and directed

K&E to provide certain additional rate information. (Op. at 12-13.)

60.     With respect to the law, K&E believes that the standard articulated by the Court,

by including the phrase "in other practice areas," (Op. at 12), contravenes (1) the unambiguous

language of Section 330 of the Bankruptcy Code; (2) controlling precedents, including the

leading Third Circuit case, Busy Beaver; and (3) the 25-year history of fee application rulings by

bankruptcy courts applying Section 330, including this judicial district, where the rate structure

at issue here has consistently been approved. We are not aware of any case where a court has

ruled that bankruptcy practitioners must lower their rates to the same level as colleagues in other

practice areas at their firm who graduated from law school at the same time, regardless of lower

24

demand for the services of such colleagues and lower rates charged for such colleagues in the marketplace for legal services. After weighing all of the arguments and evidence in this memorandum and presented at the hearing, K&E respectfully asks the Court to revise its conclusions of law on this point in whatever final order it enters.[22]

**A.    The Bankruptcy Code And Controlling Third Circuit Precedent Require The Reasonableness Of A Billing Rate To Be Determined By The Market For Comparable Legal Services.**

**1.    According to the Plain Text of Section 330, the Sole Criterion for Determining the Reasonableness of a Fee Applicant's Rate Is the Market Rate for Comparable Lawyers.**

61.    Section 330 of the Bankruptcy Code sets forth the criteria for determining the reasonableness of compensation sought in a fee application.[23] Although a variety of factors affect the overall reasonableness determination, with regard to the narrow question of what is the appropriate *rate*, there is a single, controlling Code provision. That provision, Section 330(a)(3)(A)(E), states in clear and unambiguous language that the reasonableness of billing rates is "based on the ***customary compensation charged by comparably skilled practitioners*** in cases other than cases under this title." 11 U.S.C. § 330(a)(3)(A)(E) (emphasis added). The

---

[22]  The applicable legal standard has not been fully briefed. Although K&E briefly summarized the legal standard at pp. 16-17 of K&E's Sept. 30, 2003 response [D.I. No. 3870], that cursory discussion was provided at a time when the applicable legal test was not understood to be controversial and thus was not intended to constitute full briefing on this issue. Moreover, because K&E's prior response predated this Court's opinion, it did not address the articulation of the legal standard the Court's opinion contains.

[23]  In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

   (A) the time spent on such services;

   (B) the rates charged for such services;

   (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

   (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

   (E) whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A).

25

Code thus expressly provides that a market-based determination -- what comparably skilled

lawyers are customarily compensated in the marketplace for legal services outside of Chapter 11

-- is the only way that the reasonableness of a rate may be determined.

62.    This provision of Section 330 manifests the clear congressional intention to

provide "'sufficient economic incentive [to lure competent bankruptcy specialists] to practice in

the bankruptcy courts.'" In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994)

(quoting In re McCombs, 751 F.2d 286, 288 (8th Cir. 1984)).  Before Section 330 was enacted in

1978, the Code had "favored economy of the estate over competitive compensation to debtors'

attorneys." Id.  Many courts limited fees according to "notions of conservation of the estate and

economy of administration," including a Ninth Circuit case which "set an arbitrary limit on fees

payable, based on the amount of a district judge's salary." Id. at 849 n.22 (discussing Section

330's legislative history and referring to In re Beverly Crest Convalescent Hosp., Inc., 548 F.2d

817 (9th Cir. 1976)).  Section 330 effectively overruled Beverly Crest and similar cases because

otherwise, bankruptcy specialists "who enable the system to operate smoothly, efficiently, and

expeditiously" would be driven to practice in fields where they could earn "much higher

incomes," leaving the bankruptcy field "occupied by those who could not find other work and

those who practice bankruptcy law only occasionally almost as a public service." Id.

63.    Congress averted this outcome by enacting Section 330's market-based approach

to compensation.  In the legislative history of Section 330, Congress expressly stated that

awarding fees at rates comparable to those in the prevailing market was necessary to ensure

quality representation among counsel handling Chapter 11 cases:

> "[B]ankruptcy legal services are entitled to command the same
> competency of counsel as other cases.  In that light, *the policy of*
> *[Section 330] is to compensate attorneys and other professionals*
> *serving in a case under title [11] at the same rate as the attorney*
> *or other professional would be compensated for performing*
> *comparable services other than in a case under title [11]. . . .*
> Notions of economy of the estate in fixing fees are outdated and
> have no place in a bankruptcy code."

Id. at 851 n.24 (quoting 124 CONG. REC. 33,994 (1978) (Joint Explanatory Statement) (remarks of Sen. DeConcini), *reprinted in* 1978 U.S.C.C.A.N. 6505, 6511 (emphasis added)). As the Third Circuit stated in <u>Busy Beaver</u>, "Congress has unmistakably and expressly made a policy choice favoring full compensation for debtors' attorneys over greater proportionate compensation to the debtors' creditors . . . ." Id. at 851. The Third Circuit further stated that Congress's "unambiguous policy" on this point was controlling: "[C]ourts are not at liberty to substitute their favored policies for those Congress enacts, no matter how unwise the court finds them to be." Id. at 850, 851.[24]

## 2.    The Leading Case in the Third Circuit, <u>Busy Beaver</u>, Follows the Code's Market-Based Approach.

64.    Although the plain language of Section 330 --without more -- unambiguously makes comparable marketplace rates the exclusive benchmark for assessing bankruptcy rates, the Third Circuit's holding in <u>Busy Beaver</u> confirms that this is the legal standard. In that case, the Bankruptcy Court and then the District Court disallowed fees sought for paralegal work on the ground that such work was clerical in nature and thus noncompensable overhead. The Third Circuit reversed, following the market approach mandated by the Code, because debtor's counsel presented evidence that comparable paralegal work was compensated in the marketplace. Id. at 851-56. "In keeping with the market approach," the Third Circuit stated, "it is critical that courts allow attorneys the same leeway in the types of tasks billed for at their (and their paralegals') established rate as non-bankruptcy clients permit their attorneys (and their attorneys' paralegals), or Congress' manifest intent to provide fully competitive income to bankruptcy attorneys would be transgressed." Id. at 853; see also Zolfo, Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253, 258 (3d Cir. 1995) ("We recognized in <u>Busy Beaver</u> that § 330 presents a 'market-driven approach.'").

---

[24]    See also id. at 850 ("Congress determined, it appears, that on average the gain to the estate of employing able, experienced, expert counsel would outweigh the expense to the estate of doing so, and that unless the estate paid competitive sums it could not retain such counsel on a regular basis. With this congressional determination we are in no position to quarrel.").

65.     In <u>Busy Beaver</u>, the Third Circuit gave clear guidance about what the Bankruptcy

Court should and should not do in evaluating rates.  What the Court should do, "[l]ike any

sophisticated consumer of legal services," is to "compare the costs of 'equivalent' practitioners

of the art (including billing structures) as well as applicant's billing practices with 'equivalent'

clients." <u>Id.</u> at 853.  What the Court should ***not*** do is "to review subjectively the law firm's

allocation of responsibilities and billing practices." <u>Id.</u>  This is because "[a] bankruptcy judge,

typically far removed from the economics of law practice and the exigencies of making recurring

business judgments about the most prudent and cost-effective method for performing a given

task with adequate assurances of quality in a developing, competitive legal market, is generally

not well-equipped" to make such a subjective review. <u>Id.</u>

66.     While this Court can and should use its experience with fee petitions, billing

practices and the legal profession as the starting point for any analysis, the phrase "starting

point" in this context merely means locating the questionable charges and fees and putting the

applicant to its proof that "the market would recompense him or her for that charge." <u>Id.</u> at 854.

The Court may not substitute its subjective judgment for the market, <u>id.</u> at 853, because

"'[m]arkets know market values better than judges do.'" <u>Id.</u> at 854 (quoting <u>In re Continental Ill.

Sec. Litig.</u>, 962 F.2d 566, 570 (7th Cir. 1992)).  "If the marketplace naturally establishes a price

for a service, then we believe that it is logical to assume that this is the figure to which an

informed client and an informed attorney would agree." <u>In re Patronek</u>, 121 B.R. 728, 731

(Bankr. E.D. Pa. 1990) (Ch. 13 case).  The market rate "is what an informed client and informed

attorney are actually agreeing to pay in the local marketplace.  The inquiry of what fee is

reasonable can end at that point." <u>Id.</u>  As Judge Posner opined in a securities fee case cited

favorably in <u>Busy Beaver</u>:

> It is apparent what the district judge's mistake was.  He thought he
> knew the value of the class lawyers' legal services better than the
> market did.…  He may have been right in some ethical or
> philosophical sense of "value" but it is not the function of judges in
> fee litigation to determine the equivalent of the medieval just price.
> It is to determine what the lawyer would receive if he were selling
> his services in the market rather than being paid by court order.

28

Busy Beaver, 19 F.3d at 854 n.32 (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992)).[25]

### 3. **Busy Beaver Sets Forth a Two-Pronged Test for Determining What Is a Reasonable, Market-Based Rate.**

67.     Busy Beaver and other precedents in this Circuit define how the market rate should be determined: "what *that professional* would charge and collect from its client in a similar non-bankruptcy context." In re UDC Homes, Inc., 203 B.R. 218, 222 (Bankr. D. Del. 1996) (emphasis added) (citing Busy Beaver, 19 F.3d at 849). In an analogous fee-shifting case,[26] the Supreme Court held that reasonable fees "are to be calculated according to the prevailing market rates in a relevant community," and defined prevailing market rates as "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 & n.11 (1984).

68.     In determining the market rate in a particular case, "[t]he baseline rule is for firms to receive their customary rates." Zolfo, Cooper & Co., 50 F.3d at 259; see also In re Jensen-Farley Pictures, Inc., 47 B.R. 557, 579 (Bankr. D. Utah 1985) (hourly rates of attorneys are set by the market in which they customarily practice). This is because there is a "strong presumption" that payment of a professional's standard hourly rate constitutes "reasonable compensation." In re Meronk, 249 B.R. 208, 213 (B.A.P. 9th Cir. 2000) (quoting In re Manoa Fin. Co., 853 F.2d 687, 692 (9th Cir. 1988), and declining to award bonus).

69.     Because the baseline rate carries with it merely a presumption (albeit a strong one), Busy Beaver directs the court to consider two specific types of evidence in determining the prevailing market rate:

- *First*: "the bankruptcy court should compare the costs of 'equivalent' practitioners of the art (including their billing structures)"

---

[25]   Indeed, even where "evidence proves a market rate that directly contradicts the court's judgment, the market rate must take precedence." Zolfo, Cooper & Co., 50 F.3d at 258 (citing Busy Beaver, 19 F.3d at 854, but further noting that the court may discount evidence presented by the fee applicant based on the court's own expertise).

[26]   The Third Circuit has stated that the reasoning of fee-shifting cases "transfers smoothly to the bankruptcy context." Busy Beaver, 19 F.3d at 853 n.30.

29

and

- ***Second***: the court should also compare the fee applicant's rate to "the applicant's billing practices with 'equivalent' clients."

19 F.3d at 853.

70.     Nothing in the Bankruptcy Code or <u>Busy Beaver</u> permits the Court to make a comparison between the applicant's billing rate and the rate for another attorney in the same firm who has a different type of experience and a different type of practice. Nor do those authorities permit the Court to make a comparison between the fee applicant and another lawyer who happened to graduate from law school in the same year, regardless of the nature of the other lawyer's practice or the demand (or lack thereof) for the other lawyer's services in his or her area of specialization. To the contrary, Section 330(a)(3)(A)(E) of the Code requires the court to make reference to a "comparably skilled" practitioner, not to a practitioner with ***different*** skills in a ***different*** practice area. <u>Busy Beaver</u> similarly requires the court to (1) make reference to practitioners who are equivalent to (not different from) the fee applicant, and (2) to make reference to work performed ***by the fee applicant himself or herself*** (not by colleagues in the same firm with unrelated practices) for equivalent clients.

71.     These rules are necessary if the relevant marketplace -- as opposed to subjective judgments or arbitrary comparisons to dissimilar practitioners -- is to be the guide in determining what rate is reasonable. The rules also make common sense, as the following hypothetical shows. Assume that, in the marketplace outside of Chapter 11, sophisticated clients agree to pay Lawyer X, a highly renowned restructuring expert, $700 per hour. If X's compensable rate for the same type of work performed inside Chapter 11 is determined by the rate charged by same-firm colleagues in different practice areas, then the so-called "reasonable rate" would vary wildly depending on the arbitrary happenstance of what portfolio of practice groups X's firm comprises. If the firm happens to have an insurance defense department whose litigators charge $300 an hour, Lawyer X would be knocked down to the lowest rate in that firm. If Lawyer X practices in a bankruptcy boutique, there could be no reduction based on a colleague's lower rate and presumably X would be awarded the customary $700 rate. If Lawyer X happens to have a

30

partner who specializes in complex international tax law and charges $850 per hour, presumably

X could argue that his rate should be upgraded because of the fortuity of having such an in-

demand partner.  Such a result would be absurd, and it clearly is prohibited by the Code and by

Busy Beaver.

### 4.    The Portion Of Busy Beaver Relied On By This Court Relates To Write-Offs For Inefficient Work, Not Billing Rates.

72.    This Court's ruling relies on the following citation to Busy Beaver:

> "Section 330(a) does not entitle debtors' attorneys to any higher
> compensation than that earned by non-bankruptcy attorneys" and
> the Court must ensure that the applicant "exercises the same
> 'billing judgment' as do non-bankruptcy attorneys."  Busy Beaver,
> 19 F.3d at 855-56 (quoting In re Manoa Fin. Co., 853 F.2d 687,
> 690 (9th Cir. 1988)).

(Op. at 12.)

73.    Respectfully, K&E believes the Court erred in two respects.  First, in the excerpt

from the Busy Beaver opinion quoted by this Court, the Third Circuit left out the key word from

the Manoa Finance opinion -- "comparable" -- which distorts the actual holding of Manoa

Finance.  Second, that same excerpt from the Busy Beaver opinion relates to billing judgment

and write-offs, not to billing rates; the actual holding of Busy Beaver on billing rates, contained

in an immediately preceding seven-page discussion, is different from the characterization of the

Busy Beaver holding in this Court's ruling.

74.    Manoa Finance came out of the Ninth Circuit, whose arbitrary rate ceilings had

contributed to the enactment of Section 330's market-based standard in 1978.  Counsel for the

Manoa Finance creditors committee sought a $100,000 bonus on top of compensation at

counsel's standard hourly rate.  The Ninth Circuit rejected the bonus in an opinion and holding

remarkably similar to Busy Beaver.  The Ninth Circuit first reviewed the pre-1978 history of

bankruptcy fee caps; then quoted Section 330's legislative history, including the congressional

purpose of deterring qualified bankruptcy lawyers from being driven into more lucrative fields,

and concluded that "it is clear that in adopting § 330 Congress intended a retreat from doctrines

which strictly limited fee awards under § 241 to less than attorneys might have received for

31

services of the same professional quality in non-bankruptcy cases." <u>Manoa Finance</u>, 853 F.2d at

690. Critically, in rejecting the bonus, the Ninth Circuit stated:

> [W]e think that in enacting that section [330] Congress did not intend to authorize higher compensation than attorneys would receive for ***comparable*** non-bankruptcy services.

<u>Id.</u> (emphasis added).

75.     Unfortunately, the Third Circuit's <u>Busy Beaver</u> opinion left out the key word from

<u>Manoa Finance</u> -- "comparable" -- when <u>Busy Beaver</u> paraphrased the <u>Manoa Finance</u> opinion in

a transitional phrase that was quoted in this Court's opinion.  Under the actual holding of <u>Manoa</u>

<u>Finance</u> (as well as the holding of  <u>Busy Beaver</u>), bankruptcy attorneys inside Chapter 11 are not

limited to the rates charged by non-bankruptcy attorneys.  Rather, bankruptcy lawyers are limited

to rates they "would receive for comparable non-bankruptcy services." <u>Manoa Finance</u>, 853

F.2d at 690; <u>accord</u> <u>Busy Beaver</u>, 19 F.3d at 853 (referencing billing practices used for

equivalent clients).

76.     Moreover, the single sentence from <u>Busy Beaver</u> cited in the Court's opinion does

not actually relate to the determination of reasonable billing rates; rather, it merely addresses the

uncontroversial proposition that write-offs should be treated the same inside and outside of

Chapter 11.  In <u>Busy Beaver</u>, the Third Circuit devoted the seven pages preceding this cited

sentence to a comprehensive, scholarly discussion of Section 330, its legislative history,

historical compensation practices terminated by Section 330, and the Code's "unambiguous

policy" and text establishing a "market approach."  19 F.3d at 848-55.  The Third Circuit then

concluded that rates must be scrutinized by comparisons to (1) equivalent practitioners of the art,

and (2) "the applicant's billing practice with 'equivalent' clients," <u>id.</u> at 853, not by comparisons

to same-age, same-firm non-bankruptcy lawyers, without regard to whether those colleagues'

services are equivalent or comparable.

77.     In the very next sentence after its exhaustive discussion of rates, the Third Circuit

turned to the subject of write-offs and "billing judgment" almost as an afterthought.  <u>Id.</u> at 855.

The entirety of the Third Circuit's discussion of "billing judgment" consists of the following sentence:

> Finally, because § 330(a) does not entitle debtors' attorneys to any higher compensation than that earned by non-bankruptcy attorneys, In re Manoa Fin. Co., 853 F.2d at 690, the court should review a fee application to ensure the applicant exercises the same "billing judgment" as do non-bankruptcy attorneys by, for example, writing off unproductive research time, duplicative services, redundant costs precipitated by overstaffing, or other expenses with regard to which the professional generally assumes the cost as overhead in corresponding non-bankruptcy matters, or for which analogous non-bankruptcy clients typically decline to pay.

Id. at 855-56. Clearly, all that "billing judgment" means in this context is that fee applicants in Chapter 11 must apply the same judgment to writing off unproductive time and charges as they do for other clients as a matter of routine practice.[27]

78.    K&E submits that this Court's opinion took the term billing *judgment* to mean billing *rates*, resulting in a misconstruction of the Busy Beaver holding. K&E respectfully asks the Court to modify pages 11-13 of its opinion and issue revised conclusions of law on this point.

79.    In addition, K&E notes that it has already exercised the requisite billing judgment in its First Quarterly Fee Application. Before filing the application, K&E wrote off $60,875.50 in fees and expenses according to the same kind of billing judgment K&E exercises on client bills outside Chapter 11.

**B.    The Evidence At The Hearing Will Show That K&E's Rates Are Comparable To The Market And To What K&E Charges For Similar Work Outside Of Chapter 11.**

80.    K&E will present evidence at the hearing, by way of fact and expert testimony, affidavits, and documents, including public court records, showing that the rates in K&E's fee

---

[27]    The requirement of billing judgment in the bankruptcy context "represents no more than the billing judgment attorneys regularly impose upon themselves at the 'edit' stage of the billing process before submission of a bill to a private client." Metro. Transp. Co., 107 B.R. 50, 52 (E.D. Pa. 1989) (citing In re Temple Ret. Cmty., Inc., 97 B.R. 333, 339 (Bankr. W.D. Tex. 1989)). The firm is expected in bankruptcy matters to review its bills thoroughly to ensure that the hours billed are justified. In re Kusler, 224 B.R. 180, 185 (Bankr. N.D. Okla. 1998). The estate, like a private client, should not bear the costs of services that are either excessive or duplicative of the efforts of other professionals. In re Wire Cloth Prod., 130 B.R. 798, 806 (Bankr. N.D. Ill. 1991).

application satisfy both parts of the <u>Busy Beaver</u> test.  The following discussion previews that evidence.

     **1.  The First Prong Of <u>Busy Beaver</u>:  Comparison To Equivalent Practitioners**

   81.  This prong of <u>Busy Beaver</u> directs the Court to compare the applicant's rate to the rate charged by "'equivalent' practitioners of the art." 19 F.3d at 853.  The evidence will show that K&E's rates are within the range charged by other leading national firms that handle similarly complex bankruptcies.

   82.  As Bankruptcy Judge C. Michael Stilson recognized in the <u>Globe Holdings, Inc.</u>, bankruptcy, "K&E is a national bankruptcy/corporate law firm, based in Chicago, Illinois, with offices in other cities." <u>In re Globe Holdings, Inc.</u>, No. BK 01-70115-CMS-11, slip op. at 6 (Bankr. N.D. Ala. Mar. 18, 2002).  Objections were filed to K&E's fee application on a variety of grounds relating to the firm's work as Section 327(e) special counsel to the debtor, including the objection that K&E's rates were higher than the rates charged by local practitioners.  Judge Stilson's opinion cited various authorities reflecting Section 330's market-based standard, specifically noting that the Eleventh Circuit cited <u>Busy Beaver</u> with approval for the proposition that the Court should rely on the market to determine the rates of bankruptcy counsel.  <u>Id.</u> (citing <u>In re Hillsborough Holdings</u>, 127 F.3d 1398, 1404 (11th Cir. 1997)).  Judge Stilson rejected the objections to K&E's rates because there was no evidence that K&E was charging anything other than "its usual fee for this level of service for this type of client."  <u>Id.</u> at 6.  In short, the Court found "that the hourly rates included within the K&E application are rates normally charged by K&E for similar services provided by them in bankruptcy and non-bankruptcy matters." <u>Id.</u>; <u>see also</u> <u>In re Bennett Funding Group, Inc.</u>, 213 B.R. 234, 250 (Bankr. N.D.N.Y 1997) (hourly fees of Simpson Thacher not unreasonable since they were not unusual for a law firm of its size in a major metropolitan city).

   83.  Among the significant billers whose rates were noted in Judge Stilson's opinion, were two K&E lawyers who charged different rates even though they are equal in seniority:

34

Jonathan Friedland, a bankruptcy associate charging $360 per hour, and John Jennings, a

corporate associate charging $340 an hour.[28]  In re Globe Holdings, Inc., No. BK 01-70115-

CMS-11, slip op. at 6.  No objection was made on account of the higher rate charged by a

bankruptcy-group practitioner than an equally senior corporate-group practitioner.  Judge Stilson

approved K&E's billing rates -- which followed a grid that is essentially identical, in an earlier

year, to the grid at issue here -- and approved K&E's overall fee request with minor adjustments.

Id. at 10.

84.    K&E's bankruptcy work consists of complex matters for major clients such as

ABB (parent of Combustion Engineering), AmeriServe Food Distribution, Babcock & Wilcox,

Chiquita Brands, Conseco, Exide Technologies, Harnischfeger Industries, TWA Airlines, United

Airlines, United Artists, W.R. Grace, Zenith Electronics Corp., and many others.  K&E's

bankruptcy lawyers routinely practice in bankruptcy courts throughout the country, including

Delaware, New York, California, Illinois, Louisiana, New Jersey, Ohio, South Carolina, Texas,

Virginia, and Wisconsin.  The national scope and sophistication of K&E's practice are widely

recognized in the legal community.  See, e.g., 2003 Vault Guide to the Top 100 Law Firms

(ranking K&E's bankruptcy/corporate restructuring practice third out of 100); Chambers USA -

America's Leading Business Lawyers 2003-2004 (K&E's restructuring group "has earned a

distinguished national and international reputation for providing outstanding legal advice and

judgment" and "acts for a varied range of national and international clients.").

85.    This Court can rely on its own experience and take judicial notice of the many

other major Chapter 11 proceedings handled by K&E in this District as evidence of the national

scope of K&E's representations and complex nature of its practice.  For example, in In re

Stations Holding Co., Inc., 02-10882 (MFW), K&E represented the debtor, which was the parent

company of an entity that owned and operated 22 television stations throughout the United

---

[28]  Mr. Jennings is a 1997 law school graduate and Mr. Friedland is treated as a 1997 law school graduate on K&E's grid because although he graduated earlier, his experience makes him the equivalent of a 1997 graduate in the eyes of K&E and its clients.

States.  Within six months of the petition date, K&E confirmed the debtor's Chapter 11 plan

through a merger with a publicly traded company.  Confirmation of the plan resulted in payment

to creditors owed approximately $500 million as well as a distribution to shareholders of more

than $82 million.

86.     K&E's direct peer group is a relatively small number of sophisticated, full-service

national law firms with the resources and expertise to handle complex restructuring matters.

They include such firms as Weil, Gotshal & Manges; Skadden, Arps, Slate, Meagher & Flom;

Sidley, Austin, Brown & Wood; Willkie, Farr & Gallagher; Shearman & Sterling and others who

regularly appear in major Chapter 11's here and around the country and are recognized in the

legal community for their sophistication and expertise.

87.     K&E will present evidence at the hearing that the rates for its attorneys in

Fleming are comparable to rates charged by equivalent practitioners from these peer firms on

comparable matters.  By way of an illustrative preview of that evidence, publicly-filed fee

applications from major, current Chapter 11's (of which this court can take judicial notice) show

that the $385 hourly rate for K&E fourth-year bankruptcy associate Marjon Ghasemi falls in the

range of the rates charged for fourth-year bankruptcy associates by Fried Frank ($355); Willkie,

Farr & Gallagher ($365); Shearman & Sterling ($375); Dewey Ballantine ($390); Weil, Gotshal

& Manges ($400); Cleary Gottlieb ($415); and Paul, Weiss, Rifkind, Wharton & Garrison

($430).  K&E's lead counsel in the Fleming matter, Rick Wynne, a 1982 law school graduate

whose experience and reputation exceed those of many of his contemporaries, also demonstrates

this point.[29]  Mr. Wynne's $670 hourly rate falls within the range of one of Chadbourne Parke's

bankruptcy lawyers in the Spiegel case, a 1982 graduate ($620); one of Milbank, Tweed's

bankruptcy lawyers in the Enron case, also a 1982 graduate ($650); one of Willkie, Farr &

Gallagher's bankruptcy lawyers with primary responsibility in the Adelphia case, a 1981

---

[29]   K&E will present evidence that year of graduation from law school is a relatively minor factor affecting market
rates, more so the more senior the lawyer is.  But year of graduation is used in this preliminary illustration for ease
of reference.

graduate ($695); various Weil, Gotshal bankruptcy lawyers working on Enron, including two 1984 graduates ($600 to $715) and a 1982 graduate ($735 to $800); and a 1982 graduate at Bingham McCutchen who works on NRG Energy ($735). To alleviate any concern that K&E is being selective in its examples, K&E will present the Court with a comprehensive chart capturing the rates for all lawyers representing debtors and creditors committees in the 10 largest bankruptcies filed in each of the last three years.

88.     Because K&E will be able to demonstrate that its billers meet the marketplace for comparable legal services for complex restructuring/bankruptcy matters, Section 330's test (comparison to "comparably skilled practitioners") and the first prong of <u>Busy Beaver</u> (equivalent practitioners of the art) both are satisfied and the inquiry should end there. See <u>In re Patronek</u>, 121 B.R. 728, 731 (Bankr. E.D. Pa. 1990) (if market is met, "[t]he inquiry of what fee is reasonable can end at that point.") Given the Code's policy rationale of encouraging quality counsel to handle Chapter 11 cases -- including counsel capable of handling complex, difficult cases at the high end of the market --a firm such as K&E should be entitled to have all billers on a complex Chapter 11 matter compensated at the going rate for such services. They should not have to lower the rate charged inside Chapter 11 based on considerations other than the marketplace rate applicable to their work in complex restructuring/bankruptcy matters.

> 2.      **The Second Prong of the <u>Busy Beaver</u> Test:  Comparison to the Fee Applicant's Rate for Equivalent Clients**

89.     As noted above, K&E believes that the inquiry should end once the first prong of the <u>Busy Beaver</u> test, which tracks the language of Section 330 (a)(3)(A)(E), has been satisfied. However, the Third Circuit is not explicit about what weight should be given to the second prong under <u>Busy Beaver</u> if the first prong has already been satisfied, so K&E will present evidence at the hearing showing that the second prong is also satisfied here.

90.     The second prong of <u>Busy Beaver</u> compares the rate sought to "the applicant's billing practices with 'equivalent' clients." 19 F.3d at 853. Significantly, the Third Circuit's language does not permit the court to compare a fee applicant's rate to the rate charged to

equivalent clients by lawyers from different practice areas within the applicant's own firm.  The

comparison must be made on an apples-to-apples basis, by comparing the fee applicant's own

billing rate in the fee application to "*the applicant's*" -- not someone else's -- billing practices

for equivalent clients.  Id. (emphasis added).  The comparison must be made to the rate that

would be charged by "that professional" -- not by some other, lower-cost professional in a

different practice area of the same firm -- to a similar client outside of Chapter 11.  As Judge

Balick stated in the In re UDC Homes case:

> The Third Circuit further held [in Busy Beaver] that the basis for
> that requested compensation should be based upon a market rate --
> what *that professional* would charge and collect from its client in a
> similar non-bankruptcy context.

203 B.R. 218, 222 (Bankr. D. Del. 1996) (discussing Busy Beaver, 19 F.3d at 849) (emphasis

added); accord 124 CONG. REC. 33,994 (1978) ("the policy of [Section 330] is to compensate

attorneys and other professionals serving in a case under title [11] at the same rate as the

attorneys or other professionals would be compensated for comparable services other than in a

case under title [11]" (Joint Explanatory Statement) (remarks of Sen. DeConcini), *reprinted in*

1978 U.S.C.C.A.N. 6505, 6511).

91.    K&E has supplied the U.S. Trustee and the Court with a chart containing its 2003

rates for all professionals (in all practice areas and offices) for restructuring/workout/insolvency

and similar matters.  (Ex. D).[30]  The rates are identical -- for all partners, associates, paralegals

and other K&E billers, in all practice groups and in all offices -- to the rates sought in the

Fleming fee application.  The rates are also identical, for all billers, practice groups and offices,

to the rates charged to other K&E clients for virtually all restructuring, workout and insolvency

matters, whether inside or outside of Chapter 11.

---

[30]    The names of professionals who did not bill time on Fleming are redacted; while K&E respectfully requests that
these names remain confidential, the names will be provided to the Court under seal if requested.  Furthermore,
Exhibit D reflects K&E's rate schedule for the first half of 2003 only.  As had been publicly disclosed, K&E raises
its rates from time to time, and associates move up on the rate grid once a year, effective July 1.

DOCS_DE:87505.3

92.     At the evidentiary hearing, K&E will present more detailed information about its
rates and how they are established.  K&E operates in a very complex national marketplace for
legal services, which includes a whole host of sub-markets with rates driven by multiple factors
relating to the individual lawyer, his or her area of specialization, the firm's expertise,
performance and reputation, and the nature of the work involved, a partial list of which includes:

- type of practice

- type and urgency of the matter

- nature and depth of experience developed during practice

- track record for achieving results on major matters

- specialized expertise

- years of experience

- demand for a practice group in an open and competitive marketplace

- demand for a particular lawyer in that free market

- special experience, such as Supreme Court clerkships

- reputation and rainmaking ability of the particular lawyer or practice group

- demand for, and rates charged by, peer lawyers for similar services

- lost opportunity cost for the lawyer and the firm by taking on a particular representation

- novelty or difficulty of the work

- the exigent nature of the work, including round-the-clock and holiday work

- geographic factors

- changes in the firm's cost structure and special overhead

- exceptional results

- nature and duration of any past, or prospective future, client relationship

93.     For certain matters other than restructuring, workout, and insolvency matters, the
micro-markets are so fragmented, and are affected by such a variety of individualized and

39

interdependent factors, that K&E has no one rate that applies to all matters for all clients. For these other types of matters, K&E rates may vary as a function of the type of matter, geographic factors, and the many other factors enumerated above. Some of these rates are lower than the rates for restructuring matters contained on Exhibit D, and some of them are higher. In addition, not infrequently there are bonuses and special fee arrangements that make the effective "rate" substantially higher.

94.    The key, however, is that K&E does *not* have multiple rate structures or variable rates for the type of services performed here, restructuring/workout/bankruptcy cases, and other comparable matters. Because these types of matters are national in scope and tend to have great complexity, high stakes and severe time pressures in virtually all cases, the same rate grid is uniformly used on such matters for all lawyers in all practice groups in all K&E offices, **whether inside Chapter 11 or outside of it, and regardless of whether a fee application is required.** Accordingly, Exhibit D is *the* rate structure charged to the firm's clients for essentially all bankruptcy, workout or restructuring matters.[31] The fact that a company is in bankruptcy does not change the rate K&E charges for comparable work for that company outside of bankruptcy.

95.    More specifically, and as K&E will show at the hearing, Exhibit D contains the rates that K&E consistently charged in 2003 to a wide variety of clients for bankruptcy planning, restructuring and workout matters, including: clients in out-of-court restructuring matters; clients involved with Chapter 11 cases who are not subject to fee applications; clients involved in the acquisition of assets in Section 363 sales; creditors; lenders; and ad hoc committees in out-of-court workouts or restructurings that eventually ended up in Chapter 11. Those rates are used on more firm matters overall than any other and, in particular, are commonly used on the following matters comparable in market demand to restructuring work: certain corporate matters including

---

[31]    There are extremely limited exceptions, either inside or outside of Chapter 11, as K&E will explain at the hearing. With regard to the various K&E rates that are used in non-restructuring matters and thus are not included in Exhibit D, K&E is prepared to provide that information to the Court in connection with the hearing or otherwise if requested; but we also ask the Court's leave to provide that data under seal because it contains proprietary information not germane to rates for restructuring matters that would give an unfair competitive advantage to other law firms if they obtained it.

tax, mergers and acquisitions, spinoffs, leveraged buyouts, fund formation, IPO's, and Rule 144A offerings; litigation of preferences, fraudulent transfers, injunctions, contested confirmation hearings and similar bankruptcy and restructuring-related matters; and certain other types of litigation such as TRO's, injunctions, cases taken shortly before trial or appeal, defamation and First Amendment cases, and "bet the company" cases.

96.     To summarize, the only market rates that are material to the analysis here are K&E's rates for restructuring and insolvency work, whether inside or outside of Chapter 11, as reflected on Exhibit D.  K&E has acknowledged that for certain of its lawyers, on non-restructuring matters, no one rate is used and there can be a variety of rates for that lawyer depending on the myriad factors described above.  Under the prevailing legal standard, any rate outside the marketplace for complex restructuring services is immaterial and irrelevant and may not inform the determination of the reasonable rate here.  Otherwise, lawyers who have multiple rate structures for work outside the restructuring area could be penalized by being knocked down to the lowest rate they charge any client for any type of work, even if the marketplace for that work is not comparable to the work here (conversely, such a lawyer could attempt to charge the estate an upcharge to a more expensive rate charged to clients for high-value, non-restructuring work outside of Chapter 11).  If that were the law, many lawyers who have multiple rates for different types of matters would decline Chapter 11 work, contrary to the legislative intent of section 330 and that section's legal standard, which requires comparison to the relevant marketplace.

97.     Ultimately, the decisive factor in setting rates is market demand for the firm's various services, as manifested in the give-and-take between the firm and sophisticated clients in a marketplace where those clients are free to hire K&E or not.  The fact that K&E's lawyers were extremely busy in 2003 and generally billed more hours than lawyers at many peer firms, notwithstanding that K&E has aggressively hired new lawyers for several years to try to keep up with growing client demand for the firm's services, shows that demand for K&E lawyers is high and that K&E's rate structure is at -- or even below -- the market-clearing price.

41

98.     As this Court previously noted, rates for K&E lawyers vary from individual to individual. This is the result of differing market demand for different lawyers, even for those within the same practice group who graduated from law school at the same time. For example, one litigator who graduated from law school in 1978 charges $715 per hour while another litigator who also graduated in 1978 charges $575 per hour. Rates also may vary for lawyers in different practice groups (assuming all other factors are equal), for example as the result of the high client demand in recent times for K&E lawyers practicing in specialties such as tax, restructuring/bankruptcy, and certain intellectual property work.

99.     It is, therefore, neither a surprise nor a secret that K&E charges $50 more per hour for Geoffrey Richards, a bankruptcy partner and 1995 law school graduate, than for litigation and corporate partners who also graduated from law school in 1995. The same rate differential applies for similar work performed for K&E clients outside Chapter 11. Such differentials among billing rates are normal and expected in a world where market demand controls. In the Adelphia Chapter 11, for example, the creditors committee is represented by Kasowitz, Benson, Torres & Friedman LLP. Richard Casher, a litigator and 1976 law school graduate, charges $650 per hour, less than the $725 rate of bankruptcy specialist David Friedman even though Mr. Friedman graduated from law school six years after Mr. Casher. At the same firm, 1994 law graduate and bankruptcy specialist Robert Novick charges $475 per hour, compared to $235 to $400 per hour for 1994-year litigators.

100.    K&E is no different. The rate differentials among lawyers and practice groups reflected in the Fleming fee application have been well known for years in this District (and other districts) to K&E's adversaries, the U.S. Trustee, and judges. In every case pending in this District in 2003, and in virtually all of the firm's Chapter 11 cases filed across the country for at least the past five years, K&E has charged the same rate grid as here (or a rate grid with an essentially identical structure, adjusted for year-to-year increases). K&E's rate structure has consistently been approved in this and other districts. See, e.g., In re W.R. Grace & Co., Case No. 01-01139 (JKF) (Bankr. D. Del. 2001) (interim approval); In re Trans World Airlines, Inc.,

42

Case No. 01-00056 (PJW) (Bankr. D. Del. 2001) (final approval); In re AmeriServe Food

Distrib. Inc., Case No. 00-00358 (PJW) (Bankr. D. Del. 2000) (final approval following

appointment of fee auditor); In re United Artists Theatre Co., Case No. 00-3514 (JLR) (Bankr.

D. Del. 2000) (final approval); In re Harnischfeger Indus., Inc., Case No. 99-02171 (PJW)

(Bankr. D. Del. 1999) (final approval); In re Zenith Elec. Corp., Case No. 99-02911 (MFW)

(Bankr. D. Del. 1999) (final approval); In re Dade Behring Holdings, Inc., Case No. 02-B-29021

(EOD) (Bankr. N.D. Ill. 2002) (final approval); In re Humphrey's Inc., Case No. 01-13742

(REG) (Bankr. N.D. Ill. 2001) (final approval); In re Chiquita Brands Int'l, Inc., Case No. 01-

18812 (Bankr. S.D. Ohio 2001) (final approval); In re Teligent, Inc., Case No. 02-12974 (SMB)

(Bankr. S.D. N.Y. 2001) (final approval); and In re Quality Stores, Inc., Case No. GG-0110662

(W.D. Mich. 2001) (final approval).

        101.    In Stations Holding Company, Inc., Case No. 02-10882 (MFW), K&E submitted

its final fee application [D.I. No. 237] to this Court after confirming the debtors' Chapter 11 plan

that paid creditors' claims and made a substantial distribution to shareholders. On December 19,

2002, the Court entered its Order approving K&E's final fee application [D.I. No. 263]. That

application contained rates and rate structures consistent with the rates and rate structure charged

by K&E in these cases. Lawyers in different practice groups had different rates even though

their law school graduation year is the same. For example, Chris Lane, a 1998 law school

graduate and associate in K&E's bankruptcy group, had the same billing rate ($350) as Robert

Goldberg, a 1997 law school graduate and associate in K&E's corporate group. The rates of

Lane and Goldberg were also $40 lower than the $390 hourly rate charged for Kevin Coenen, a

1997 law school graduate and associate in K&E's tax department. See Stations Holding, [D.I.

No. 237]. Similarly, the final fee application approved by this Court in the Zenith cases

contained a virtually identical rate grid, including variations among particular lawyers' rates

based on numerous factors, specifically including their area of practice. See Zenith Elec. Corp.

[D.I. No. 369].

102.    These types of variations in rates among K&E lawyers are legitimate reflections of the market forces that set rates.  As such, they are reasonable under the standard of Section 330(a)(3)(A)(E) and <u>Busy Beaver</u>.  They should be approved here, just as they were in all of the prior cases.

103.    K&E genuinely believes that if the standard articulated in the opinion -- mandatory lowering of rates for bankruptcy lawyers to rates charged by lawyers of equal seniority in different practice groups -- were the law, it would radically affect the way that all firms handling complex restructuring matters practice law.  Such firms would have three basic choices.  First:  lower billing rates of bankruptcy/restructuring lawyers below the rate set in the free market, contrary to the incentives Congress established for attracting top-flight, well-compensated lawyers to bankruptcy practice.  Second:  raise billing rates for lower-priced lawyers in other practice groups above the market rate for such services, undoubtedly resulting in substantial loss of business for those lawyers and for the firm as a whole, for no rational reason. Third:  break off bankruptcy practitioners from lawyers in other practice groups into separate firms, so that bankruptcy lawyers practice predominately in boutiques that can be compensated at market-clearing prices.  None of these outcomes is consistent with the scheme for encouraging high-quality counsel in Chapter 11 cases Congress established when it passed Section 330 in 1978.

**5.      PSZYJ&W's Response To The Court's Rate Analysis**

   **A.      PSZYJ&W's Staffing And Hourly Rates -- Blended Or Otherwise -- Are Well Within Market Norms And Reasonable, Given The Tasks That The Debtors Asked PSZYJ&W To Perform.**

104.    The Trustee asserted in her Objection that PSZYJ&W's staffing in these cases was top heavy with senior attorneys.  (Obj. at ¶ 14.)  PSZYJ&W refuted this argument in its initial response [D.I. No. 3867], demonstrating that the Trustee's argument was based in large part on a labeling as "senior" PSZYJ&W attorneys with billing rates that are the equivalent of junior associates in other firms.

44

105.    The Court appears to concur with PSZYJ&W that the Trustee's focus on the age of PSZYJ&W attorneys, rather than billing rates, is misplaced. The Court, however, echoes the Trustee's challenge to the reasonableness of PSZYJ&W's blended rate for services performed during the first quarter.

106.    PSZYJ&W's blended hourly rate (solely for attorney time) was $419 per hour. As PSZYJ&W pointed out in its initial response, this blended hourly rate is materially lower than the blended hourly rate of other national firms involved in these cases, and is the equivalent of the rate charged by Milbank, Tweed (counsel for the Creditors' Committee) for a fourth-year associate.[32]

107.    The Court, however, asserts that PSZYJ&W's blended rate is not low "in comparison with other firms in Wilmington." (Op. at 14.) The Court also states that, according to the K&E Blended Rate Survey: "It appears that PSZYJ&W's blended rate is more than most other firms in this city," and instructed PSZYJ&W to submit evidence including "a complete survey of Wilmington firms and other major firms practicing before us and their blended rate based on the attorneys and paralegal billing fees in bankruptcy cases." Id.

108.    PSZYJ&W is in the process of preparing this survey in connection with the evidentiary hearing as requested by the Court. PSZYJ&W discusses its preliminary findings (as to what it expects the survey to show) below. PSZYJ&W, however, also respectfully questions three of the Court's underlying, fundamental assumptions: (1) that proper staffing can be determined by simply comparing firms' blended rates from one case to the next without regard for the relative complexity of the cases or the tasks the firm(s) performed; (2) that PSZYJ&W is a Wilmington-based firm and the proper basis for comparison of PSZYJ&W's blended rate in these cases is with firms located in Wilmington; and (3) there is a market or benchmark blended rate that co-counsel in a mega-case should appropriately charge. PSZYJ&W respectfully submits that each of these assumptions is incorrect. Specifically:

---

[32] PSZYJ&W's recitation of this fact is in no way intended to disparage the work of this attorney.

1.      **Except In Extreme Cases, A Blended Rate Is Not A Meaningful Measure Of The Reasonableness Of Attorneys' Fees Incurred In Representing A Client.**

   a.      **The Amount of a Blended Rate Is Not a Proper or Accurate Measure of Fee Reasonableness.**

109.    As discussed in depth, in respect of the reasonableness of K&E's fees, Bankruptcy Code Section 330 and Busy Beaver mandate that fees in Chapter 11 cases be determined primarily based by market forces -- *i.e.*, the "customary compensation charged by comparably skilled practitioners in cases other than cases under this Title." 11 U.S.C. § 330(a)(3)(A)(E). The Third Circuit has adopted a market-driven approach to determine the reasonableness of fees. Zolfo, Cooper, 50 F.3d at 260; In re Patronek, 121 B.R. 728, 731 (Bankr. E.D.Pa. 1990).[33]

110.    The Court, however, appears to assume that the blended rate charged by a firm in representing a client is, standing alone, a decisive measure of the reasonableness of requested fees. PSZYJ&W respectfully submits that this approach is contrary to what Busy Beaver and Bankruptcy Code § 330 require. Moreover, blended rates have no necessary relationship to the reasonableness of requested fees.

111.    Obviously, in some extreme cases, it may be clear that blended rates charged to perform routine tasks are facially exorbitant.  See Ursic v. Bethlehem Mines, 719 F.2d 670, 677 (3d Cir. 1983) (holding that routine tasks should not be performed by senior partners and observing that "a Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn").

112.    As noted in its prior responses, however, PSZYJ&W does not believe that its personnel that charge at senior rates generally performed routine tasks. The Court appears concerned that PSZYJ&W's blended rate is simply higher as a general matter, reflecting

---

[33]  The Third Circuit has also held that, "in keeping with the market approach, it is critical that courts allow attorneys the same leeway in the types of tasks billed for at their . . . established rate as non-bankruptcy clients permit their attorneys . . . or Congress' manifest intent to provide fully competitive income to bankruptcy attorneys would be transgressed."  Busy Beaver, 19 F.3d at 853 (3d Cir. 1994) ("A bankruptcy judge . . . is generally not well-equipped to review subjectively the law firm's allocation of responsibilities and billing practices."); cf. In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992) ("[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.").

46

inefficiency. As a general matter, however, the reasonableness of fees incurred and the blended rate of the fees incurred to accomplish the task have no necessary correlation.

113.    Assume, for example, that two essentially identical asset sales are conducted by two firms -- Firm A and Firm B -- in two parallel Chapter 11 cases. Firm A employs junior personnel billed on a blended basis at $400 per hour. These attorneys take 200 hours to complete the sale, resulting in a total fee of $80,000. Firm B uses more senior personnel, charging a blended rate of $500 per hour. These more senior attorneys have consummated asset sales countless times before. Firm B attorneys therefore require only 150 hours to consummate the sale. Firm B's total bill is $75,000.[34]

114.    Neither Firm A nor Firm B staffed this hypothetical sale inappropriately. A host of considerations -- including time pressure and available personnel -- go into every staffing decision. Firm B, however, provided better service than Firm A by delivering a quicker result for $5,000 less in actual fees. Under a blended rate analysis, however, Firm B is subject to fee reduction because its blended rate is $100 more than that charged by Firm A -- an illogical result.

115.    In sum, a focus on blended rates untempered by analysis of the reasonableness of actual fees incurred is simply arbitrary and has no necessary correlation to the market-based compensation to which counsel is entitled to receive in a bankruptcy case.[35] This point was

---

[34]    The foregoing hypothetical illustration is not an academic exercise. There is no evidence that average blended rate is a material consideration to clients in the marketplace -- clients are far more concerned with the availability of its attorneys to deliver results within the necessary timeframe at an aggregate cost that is within expectations -- the attorney only blended rate is almost irrelevant in the marketplace. The Court cites approvingly (Op. at 4) the opinion of Judge Karen Jenneman discussing fee standards in In re Gencor Ind, Inc., 286 B.R. 170 (Bankr. M.D. Fla. 2002). PSZYJ&W was debtor's counsel in Gencor. PSZYJ&W will submit, in conjunction with the evidentiary hearing, an affidavit of John Elliot, the Executive Vice President of Gencor. As a matter of client preference, over eighty percent of the time charged by PSZYJ&W to Gencor was incurred by two senior shareholders. The result was most certainly a blended rate that was off the charts, as compared to what might be considered "normal." The work was nonetheless performed in such an expedited, efficient manner that, following the confirmation of Gencor's plan of reorganization, Gencor applied to the court for authority to pay a bonus to PSZYJ&W, which Judge Jenneman approved notwithstanding PSZYJ&W's high blended rate. Id. at 170. Judge Jenneman recognized that PSZYJ&W's "high rates" (by local Florida standards) were an insignificant consideration, given that PSZYJ&W achieved "an extraordinary success quickly, efficiently and effectively." Id.

[35]    The Court cited cases expressing concern over high blended rates. Op. at 12-13. In no cited case, however, did a court reduce fees on the basis of "high blended rates." In Zolfo, Cooper, the actual reductions were based upon "the nature, extent and value of the services" rendered, not blended rate. 50 F.3d at 259. In Ursic, the Court's "Michelangelo" comment was dicta which had no ultimate bearing on the Court's opinion. In sum, we are aware of no case in which fees were reduced solely on the basis of a perceived "too high" blended rate.

47

made persuasively by Judge Fitzgerald in In re Pain Clinic, Inc., No. 96-25315 JKF, 2000 WL

134735, at *4-5 (Bankr. W.D. Pa. Feb 3).  In Pain Clinic, the United States Trustee objected to

the fees charged to a Chapter 11 estate by a sole practitioner who did essentially all of the work

in the case.  As here, the Trustee argued that such top-heavy staffing resulted in an improperly

high blended rate, without any analysis of specific tasks where overcharging allegedly existed.

Judge Fitzgerald rejected any such argument as based on nothing more than speculation:

> The U.S. Trustee has not pointed to any authority for the
> proposition that the court or the U.S. Trustee may require a sole
> practitioner to hire an associate and/or to dictate the hourly rate to
> be charged by (or salary to be paid to) such an associate.
> **Moreover, there is no evidence in the record that the amount of
> time within which Ms. Reitmeyer performed the unspecified
> "routine" tasks would have been the same amount required by
> a less experienced attorney or that such work would not have
> to be reviewed by Ms. Reitmeyer as the hypothetical senior
> attorney.** The record is devoid of evidence that a less experienced
> associate who billed at an unspecified hourly rate less than $240
> per hour would not have accumulated additional time charges for
> services identical to Ms. Reitmeyer's, with the effect upon the
> estate being an identical or higher charge than is now requested,
> particularly in light of Ms. Reitmeyer's use of a $45 per hour
> paralegal, for a blended hourly rate. . . .
>
> * * *
>
> The U.S. Trustee's argument is based on non-existent facts and is
> not persuasive.  No lawyer seeking fees from a bankruptcy estate
> bears the burden of proving a hypothetical negative, i.e., that her
> charges to the estate would have been less if she operated her law
> practice as something other than what it is – a solo office.  Rather,
> her burden is to establish that her charges are reasonable for the
> time spent on the services provided, given their nature and extent.
> 11 U.S.C. § 330(a); In re Busy Beaver, 19 F.3d at 849.

Id. (emphasis added).

116.    The multitude of tasks performed by PSZYJ&W in these cases during the first

quarter (which, as discussed below, almost uniformly go far beyond the tasks normally handled

by local counsel) are set forth in Section 3.c below.  As in Pain Clinic, the Trustee here has not

pointed to a single task where the fees charged by PSZYJ&W would have been less had the

matter been appropriately staffed (in the Trustee's opinion) with attorneys billed out at lesser

rates.  As in Pain Clinic, there has been no specific suggestion at all that these Debtors would

48

have benefited by any kind of alternative PSZYJ&W staffing.  Absent such specifics, the

contention that PSZYJ&W's blended rate is simply too high has no context -- whether a blended

rate is higher or lower than an abstract norm has no relationship to whether PSZYJ&W provided

cost-efficient services to its clients at market rates.

> **b.      Blended Rates Are an Even Less Reliable Indicator of Fee Reasonableness When Only One Fee Period Is Considered, Because Blended Rates Will Vary Depending Upon the Stage of a Case.**

117.    As indicated above, a naked blended rate analysis is a marginal indicator of fee

efficiency in the best of circumstances.  A blended rate analysis is an even less reliable measure

of efficiency if one is attempting to compare blended rates incurred in cases at different

reorganizational stages.  Specifically, unless a fact finder thoroughly reviews what tasks were

performed during a given fee period in the comparable cases, it is almost meaningless to

abstractly compare blended hourly rates.

118.    Simply as an example, a firm representing a client in the claim objection phase of

a case will likely have a drastically lower blended rate than a firm representing a client in free-

fall in the early days of a case (as here).  A comparison of blended rates in such diverse cases is

simply not an apples-to-apples comparison.

119.    In sum, it is almost impossible to construct a survey of blended rates which would

fairly compare a blended rate of a single time period in one case with the rates incurred over the

same time period in another case.  Again, the probative value of a blended rate analysis is

dubious at best, and is, in any event, not an appropriate substitute for the market-based standard

mandated by Bankruptcy Code § 330 and the Third Circuit.

> **2.      PSZYJ&W Is A National Law Firm Which Was Retained In These Cases Largely Because Of The Depth Of Its National Bankruptcy Resources And In Contemplation Of The Fact That Lawyers With A National Scope Of Practice Would Be Handling Substantive Matters.**

120.    To the extent the Court believes a blended rate analysis, standing alone, is

materially useful in determining the reasonableness of PSZYJ&W's fees, the Court must then

determine the proper peer group and peer cases for comparison.  As indicated, the Court assumes

in its Opinion that firms located in Wilmington are the proper basis for comparison here. PSZYJ&W respectfully submits, however, that given the circumstances of these cases and the terms of PSZYJ&W's retention in these cases, PSZYJ&W's proper peer group for analysis of its fee structure is other national Chapter 11 firms because that is the predominate nature of the services PSZYJ&W was retained to provide.

121.    Attorneys' hourly rates are also "fixed by the market in which they customarily practice, not by the Court." In re Jensen-Farley Pictures, Inc., 47 B.R. 578, 579 (Bankr. D. Utah 1985). Therefore, in cases where the size, scope and/or complexity require the involvement of lawyers from around the country, hourly rates should be compared on a national basis. In re Atwell, 148 B.R. 483, 488 (Bankr. W.D. Ky. 1993); see also In re Bennett Funding Group, Inc., 213 B.R. 234, 250 (Bankr. N.D.N.Y. 1997) (hourly fees of Simpson Thacher not unreasonable since they were not unusual for a law firm of its size in a major metropolitan city); Pintlar Corp., No. 93-02986, 93-02987, 1994 WL 704441, at *2 (Bankr. D. Idaho Nov. 30) (New York law firm permitted to charge its rates in Idaho due to national character, size and complexity of bankruptcy case); cf. Blum v. Stenson, 465 U.S. 886, 895 (1984) (determination of reasonable rate is made by comparing rate to commensurate rate in relevant community); but see Zolfo, Cooper, 50 F.3d at 260 (court should look to professional's customary market, which here was New York, even though Zolfo, Cooper has clients nationwide).

122.    PSZYJ&W is a law firm with 78 lawyers, with offices in Los Angeles (its largest office), New York, Wilmington, and San Francisco. Only twelve of PSZYJ&W's 78 lawyers are based in Wilmington.[36]

---

[36]    Just three of these Wilmington-based attorneys billed more than twenty hours to these cases in the first quarter.

50

123.    As indicated in its Initial Response, PSZYJ&W's attorneys also have served as first-chair counsel for debtors and committees in dozens of huge cases across the country, including the following:

| Case | Filed Claims | Representation | Jurisdiction Pending |
|---|---|---|---|
| PG&E Corporation | $18,000,000,000+ | Parent | N.D. Cal. |
| Covad Communications | $2,000,000,000+ | Debtor | Delaware |
| DirecTV Latin America, Inc. | $2,000,000,000+ | Creditors Committee | Delaware |
| ACandS, Inc. | $2,000,000,000+ | Debtor | Delaware |
| Breed Technologies | $1,600,000,000+ | Debtor | Delaware |
| Superior Telecom | $1,400,000,000+ | Debtor | Delaware |
| First Executive Corporation | $1,000,000,000+ | Creditors Committee | C.D. Cal. |
| Panell Kerr Foerster | $800,000,000+ | Creditors Committee | C.D. Cal. |
| Northpoint Communications | $520,000,000+ | Creditors Committee | N.D. Cal. |
| Continental Airlines | $500,000,000+ | Debtor | Delaware |
| AgriBiotech | $400,000,000+ | Creditors Committee | N.D.N.Y. |
| Gateway Educational Products | $400,000,000+ | Debtor | C.D. Cal. |
| First Capital Holdings | $400,000,000+ | Creditors Committee | C.D. Cal. |
| Sunworld | $300,000,000+ | Equity Committee | C.D. Cal. |
| American Tissue | $300,000,000+ | Debtor | Delaware |
| General Cinemas | $250,000,000+ | Creditors Committee | Delaware |
| Loew's Cineplex | $250,000,000+ | Creditors Committee | S.D.N.Y. |
| American Rice | $200,000,000+ | Debtor | S.D. Tex. |
| Commonwealth Equity Trust | $150,000,000+ | Debtor | E.D. Cal. |
| Wherehouse Entertainment, Inc. | $150,000,000+ | Creditors Committee | Delaware |
| Sizzler Restaurants, International | $100,000,000+ | Debtor | C.D. Cal. |
| TIE Communications | $100,000,000+ | Debtor | C.D. Cal. |
| Qintex Entertainment | $100,000,000+ | Creditors Committee | C.D. Cal. |
| Gencor Industries, Inc. | $100,000,000+ | Debtor | M.D. Fla. |
| Freedom Forge | $100,000,000+ | Debtor | Delaware |
| Focal Communications, Inc. | $100,000,000+ | Debtor | Delaware |
| RBX Corp. | $100,000,000+ | Debtor | West Virginia |

124.    Since PSZYJ&W's practice is a national practice, the reasonableness of PSZYJ&W's bankruptcy rates must be determined by comparing them to other firms who are PSZYJ&W's peer firms in bankruptcy.

125.    Obviously, one of the reasons Debtors retained PSZYJ&W was because they needed a firm with a Wilmington presence in order to effectuate a Delaware filing.  As explained in the firm's prior responses, however, this was not the primary reason for the retention of PSZYJ&W.  Rather, Debtors retained PSZYJ&W in an atmosphere of extreme crisis only a few days before the necessary filing, to tap PSZYJ&W's national resources and keep Debtors afloat.[37]

126.    PSZYJ&W represents its clients in mega-cases pursuant to a rate structure that is materially lower than the rates charged by every other nationally recognized reorganization firm. The rates charged by PSZYJ&W attorneys are well below market on a national scale and have been consistently approved by bankruptcy courts without controversy.  The evidence of the below-market nature of PSZYJ&W's rates, as compared to other national firms, is incontrovertible.  As examples:

> The highest billable rate charged by a PSZYJ&W shareholder during 2003 was Richard Pachulski, with a billing rate of $650.00. Mr. Pachulski has personally headed no less than ten debtor or creditors committee cases involving over $300 million in debt. Mr. Pachulski's first-chair Chapter 11 experience is extensive.  As reflected in the K&E Individual Rate Survey, however, Mr. Pachulski's billing rate for 2003 is the equivalent of the rate charged by mid-level partners in many firms in Chicago, New York and Los Angeles.  PSZYJ&W's rate structure is driven off of Mr. Pachulski's below-market rate, resulting in across-the-board rates which are consistently below market -- comparing attorneys of similar experience -- as compared to other nationally recognized Chapter 11 firms.
>
> The most senior Los Angeles-based shareholder who regularly worked on these cases, Ira Kharasch, class of 1982, has over twenty years' experience as a bankruptcy lawyer.  His billing rate is $490 per hour.  This rate is equivalent in these cases to the rate charged by Lena Mandel, a senior attorney with Milbank, Tweed, who was admitted in 1990, and substantially below the rate charged by Dennis Dunne ($695/hr.), a partner with Milbank, Tweed admitted in 1991.

---

[37]   As discussed below, PSZYJ&W has performed a multitude of tasks requested of it by Debtors, using its nationally-based personnel.  As explained in seven pages of single-spaced detail in its prior supplemental response (and as discussed below), senior PSZYJ&W shareholders based in Los Angeles and San Francisco took the lead role in many critical tasks necessary to avoid a liquidation of these estates.

As one comparison, PSZYJ&W's blended rate in this case during the first quarter -- $419 per hour (excluding paraprofessional time) -- is $82 less than the Milbank, Tweed blended rate in these cases.

Two PSZYJ&W attorneys involved in these cases, each with over twenty years' experience, have a billing rate less than mid-level associates rendering services on behalf of the creditors committee.

PSZYJ&W's rates are far less than those charged by Skadden, Arps for Wilmington-based personnel at a similar level of experience. Skadden, Arps is perhaps most closely analogous to PSZYJ&W in terms of a firm with a Wilmington office and a national bankruptcy practice. The head of Skadden, Arps' Wilmington bankruptcy practice is Greg Galardi, an attorney with fourteen years' experience. Mr. Galardi's 2003 rate was $625 per hour -- $65 more than the rate charged in 2003 by Laura Davis Jones, who heads PSZYJ&W's Wilmington office. Ms. Jones was admitted in 1986 and has eighteen years' experience.

127.    Unquestionably, the rates of Chapter 11 practitioners in Los Angeles, San Francisco and New York who practice on a national level are generally higher than Wilmington-based practitioners. The large amounts of time spent by those practitioners will inevitably result in a higher blended rate than would arise if attorneys based in Los Angeles and San Francisco had billed no time to these cases. Again, however, Debtors retained PSZYJ&W precisely in order to take advantage of PSZYJ&W's national resources. PSZYJ&W therefore submits that, in these cases, a comparison of PSZYJ&W's blended rate to the blended rate of exclusively Wilmington-based firms is not appropriate.

> 3.    **The Market Or Appropriate Blended Rate Of Co-Counsel In A Chapter 11 Mega-Case Is Largely Dependent Upon The Extent Of Responsibility The Co-Counsel Is Retained To Accept. PSZYJ&W's Blended Rate Is Reasonable, Given The Responsibilities It Has Been Given.**

128.    To the extent the Court rejects PSZYJ&W's argument that blended rates are not a proper or material indicia of fee reasonableness, PSZYJ&W expects that the evidence at the hearing will demonstrate as follows:

> a.    **PSZYJ&W's Blended Rate Varies Widely From Case To Case, Dependent Almost Entirely On The Role That PSZYJ&W Is Asked To Perform.**

129.    The responsibilities of lead counsel, co-counsel and local counsel are extremely fluid. As indicated, PSZYJ&W often handles mega-cases on a first-chair basis in Delaware and

53

across the country. PSZYJ&W is also sometimes retained by non-Delaware based law firms to provide a relatively passive support role as local counsel for Delaware filings. In other instances (such as here), PSZYJ&W is retained as co-counsel in respect of a Wilmington filing, primarily because of the resources the firm can bring to bear in assisting lead counsel on highly sophisticated and substantive matters. PSZYJ&W's blended rate as co-counsel necessarily varies significantly from case to case, depending upon the sophistication of the matters that PSZYJ&W is requested to address.

130.    For example, in one case -- DirecTV Latin America -- PSZYJ&W's blended rate (excluding paraprofessionals) is $429.00 (and has been paid without objection or comment). This blended rate is a function of the nature of the representation -- as here, PSZYJ&W is responsible for highly substantive matters in a multi-billion dollar case.

131.    At the other end of the spectrum, PSZYJ&W has a traditional, local counsel role with generally little substantive responsibility in certain of its cases, or at certain periods of time in other of its cases. For example, during certain time periods in W.R. Grace & Co. and Exide Technologies, PSZYJ&W's role was primarily a traditional, local counsel role to the debtor, and PSZYJ&W's blended hourly rate was $285.70 and $314.59 per hour, respectively (excluding paraprofessionals).

**b.    PSZYJ&W's Blended Rate for Traditional Non-Substantive Local Counsel Representation Is at or Below Market.**

132.    As noted immediately above, PSZYJ&W believes that the evidence will also show that PSZYJ&W's blended rate when performing traditional, local counsel work is generally at or below the blended hourly rates of other Wilmington firms performing similar roles.

133.    In sum, there simply is no basis for concern that PSZYJ&W is more expensive than other Wilmington-based firms when performing similar, local counsel functions.

     **c.**    **PSZYJ&W's Blended Rate in These Cases Is Significantly Higher Than Would Be the Case had PSZYJ&W Assumed a Traditional Local Counsel Role Because PSZYJ&W Was Specifically Hired in Contemplation That PSZYJ&W Would Assume a Substantive Role Requiring Senior Staffing.**

134.    As indicated, when called upon to do so, PSZYJ&W is structured and handles traditional, local counsel work in Delaware in an extremely efficient and economical manner. The result in recent cases is a blended rate of approximately $300 per hour (excluding paraprofessionals), well below the blended rates charged by other Wilmington-based firms performing a traditional local counsel role.

135.    PSZYJ&W's blended hourly rate during the First Application Period is $419 per hour. This rate of $419 per hour is: (a) as indicated, equivalent to the hourly rate of a mid-level associate providing services as lead counsel for the Creditors' Committee in these cases, and (b) approximately 20% higher than the averaged blended rate charged by Wilmington-based firms in a traditional local counsel role.

136.    The sole reason for PSZYJ&W's higher blended rate in these cases is that the Debtors retained PSZYJ&W to take lead or substantial responsibility on crucial aspects of these cases. As discussed in PSZYJ&W's Supplemental Response, these tasks included:

    Sara Lee Constructive Trust litigation (lead responsibility)

    The sale of the Rainbow Food Grocery Stores (lead responsibility)

    Objections to the sale of additional residual assets (lead responsibility)

    Establishment of reclamation procedures (lead responsibility)

    RTX Trucking Company objections (lead responsibility)

    Eddy Stone & Associates emergency motion (lead responsibility)

    EFS National Bank set-off motion (lead responsibility)

    Sale of Arizona liquor licenses (lead responsibility)

    Placid Refining Co. reclamation motion (lead responsibility)

    Kraft Foods relief from stay motion (lead responsibility)

55

> Broadway Crossings II LLC § 365(d)(3) motion (lead responsibility)
>
> Utility company objections (lead responsibility)
>
> Retention of professionals (significant responsibility)
>
> Assumption, assignment and rejection of unexpired leases (significant responsibility)
>
> Rejection of certain executory contracts (significant responsibility)
>
> Payment of prepetition taxes (significant responsibility)
>
> PACA issues (significant responsibility)

137.    PSZYJ&W fees incurred relating to the foregoing substantive responsibilities far exceed the fees that might be earmarked for traditional, more passive local counsel responsibilities.  Debtors expected to receive (and did) senior, national-level staffing from PSZYJ&W concerning these added responsibilities -- they represent a significant majority of PSZYJ&W's total first quarter bill.  Per the Court's instructions, PSZYJ&W is attempting to prepare a survey to compare PSZYJ&W's $419 blended rate incurred during the first quarter with the blended rates of major firms that appear in Delaware, and Wilmington-based firms where such firms accepted the amount of substantive responsibility PSZYJ&W has accepted here.  Such a comparison, however, may be impossible because Wilmington-based firms do not normally take such a role in mega-cases.

138.    In sum, PSZYJ&W respectfully submits that there is no "one size fits all" rate appropriate for all local counsel or co-counsel involved in a Delaware mega-case which can approximately be used as a substitute for the market-based approach mandated by Bankruptcy Code § 330.  The so-called "appropriate" blended rate is dependent entirely upon the services the firm was retained to perform, and can only be evaluated in the context of the total cost of performing the required services.  Those services vary on a case-by-case basis.  Here, PSZYJ&W was also retained to perform sophisticated legal services on critical aspects of matters involving tens of millions of dollars.  PSZYJ&W's responsibilities went far beyond a traditional local counsel role.  Accordingly, PSZYJ&W staffed the cases with national-level

56

personnel.  PSZYJ&W's resulting blended rate is nonetheless materially less than the blended

rate of other firms that provided substantive legal services in these cases.  Moreover, even if the

benchmark, traditional local counsel blended rate is used in comparison, PSZYJ&W's blended

rate here -- $419 per hour -- is only perhaps 20% higher than the "normal" rate charged by

Wilmington-based firms for performing far less non-substantive local counsel roles in recent

mega-cases.  By any measure, PSZYJ&W's blended rate is at or below any definable market

standard.

Dated:  January 22, 2004

KIRKLAND & ELLIS LLP

*James HM Sprayregen PC Wynne*

James H. M. Sprayregen, P.C. (ARDC No. 6190206)
Richard L. Wynne (CA Bar No. 120349)
Eric C. Liebeler (CA Bar No. 149504)
Geoffrey A. Richards (ARDC No. 6230120)
777 South Figueroa Street
Los Angeles, CA 90017
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

*Laura Davis Jones*

Laura Davis Jones (Bar No. 2436)
Ira D. Kharasch (CA Bar No. 109084)
Scotta E. McFarland (Bar No. 4184)
Christopher J. Lhulier (Bar No. 3850)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier No. 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession

57